238 N.J. Super. 482 (1990)
570 A.2d 40
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
PHILLIP ANTHONY CASTRO, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 23, 1990.
Decided February 9, 1990.
Before Judges LONG, LANDAU and LOWENGRUB (temporarily assigned).
*483 Patrick J. Bartels, Assistant Prosecutor, argued the cause for appellant (Alan A. Rockoff, Middlesex County Prosecutor, attorney; Patrick J. Bartels of counsel and on the letter brief).
Donna R. Newman argued the cause for respondent (Larry Bronson, attorney; Donna R. Newman on the letter brief).
The opinion of the court was delivered by LANDAU, J.A.D.
On leave granted, the State appeals from an interlocutory order suppressing evidence "obtained as a result of the warrantless seizure of defendant" Phillip A. Castro (Phillip). The effect of the order is to bar evidence respecting a bag of cocaine which a police officer saw Phillip discard at the home of his uncle Louis Castro.
The State argues that the suppression order should be reversed because the officer's actions were "reasonable and justified in light of the exceptional circumstances in this case." We agree and reverse.

FACTS
In November 1987, Phillip was an 18-year old senior at John F. Kennedy High School in Iselin. John Belz, a vice-principal, was administrator of the school's Chemical Health Intervention Program, and had received training respecting substance abuse and effects upon individuals who ingest cocaine.
While performing a routine check of a boys' restroom, Belz heard sniffing noises and observed Phillip holding cellophane or wax paper inches from the face of another student who was leaning over the paper. Belz asked Phillip to give him the material he was holding, but "he stuffed whatever it was into his mouth" and fled, ignoring calls to stop. By then, the class change period began and the halls were filled with students. Belz went to the main office and told the principal of his observations. He recognized Phillip, but didn't remember his name and so he tried first to identify Phillip from yearbook *484 pictures. When this proved unsuccessful, Belz checked the class schedule of the second student, whose name he knew, and summoned him from class.
Belz learned Phillips's name from the student. He also learned that the substance being held to that student's face was cocaine, and was told that "Phil has been doing cocaine in the gym all morning." Belz informed the security counselor, and tried unsuccessfully to reach Phillip's parents. Police were immediately summoned and Victor Monteiro, a uniformed police officer who had also been a safety counselor at a nearby high school, responded shortly after 10:00 a.m. when he came on duty after a shift change. There was a shortage of available officers prior to that time.
It had already been ascertained that Phillip did not attend his second period class, so a computer check of school records was made to ascertain Phillip's residence address. This was listed as 208 Regina Street, the home of Louis Castro. Monteiro was shown yearbook pictures of both Phillip and his cousin James whom he resembled. Belz told Officer Monteiro that Phillip "had shoved something down his throat and it was possibly drugs ..." This was confirmed by the second student.
Belz testified to his concern that Phillip had put something dangerous "down his throat" and that he relayed that to Officer Monteiro, using two fingers to demonstrate how Phillip forced the packet or bag down his throat. This demonstration was confirmed by Monteiro, who testified that he checked the yearbook pictures and the records, then left for Regina Street between five and ten minutes after he arrived. His experience suggested that Phillip would probably flee to his home or to a familiar place. The Regina Street address was only two or three blocks from the school.
James Castro answered Monteiro's knock. Monteiro testified that he inquired for Phillip and was told he wasn't there. He asked for James' identification to reconcile doubts on this score, and, according to Monteiro, was invited to step into the foyer of *485 the house while James went for the identification. The weather was extremely cold.
As Monteiro stood facing the foot of the stairs, he saw and heard movements behind a first floor door. James was at the top of the stairs, and Monteiro asked, "Are you sure there's no one home with you?" When he answered, "no," the officer went to the doorway where the movements occurred and he saw Phillip. Monteiro ordered him to come up. Phillip's left hand was clenched. He then dropped and kicked what appeared to be a white plastic or cellophane ball under the baseboard heater. He was patted down and then Monteiro "pulled out" a small, cellophane ball object, containing white powder somewhat caked, from under the heater.
Monteiro testified that he proceeded from the foyer to the inside doorway because he heard human movements and "number one, I believed that Phillip was there and that he was in some danger from ingesting whatever white powder was in that packet Mr. Belz saw." On cross-examination, Officer Monteiro stated that he was definitely concerned for Phillip's health, and that, "[a]t that time I was under the impression he had swallowed a packet of unknown size" and that it could have been a very little or a lot.
He further testified on cross-examination that his purpose in going to the house was to "contact an ambulance and get him assistance," and that Phillip would not have been arrested absent contraband. He said he told James that there had been an incident at school and that Phillip might have ingested a controlled substance. The credibility of this concern was enhanced by the fact that Officer Monteiro immediately summoned an ambulance which arrived within minutes after Phillip was discovered.
James Castro testified that he did not invite the officer to step into the foyer while he secured identification. He first stated that "I closed the door behind me. I pushed it closed," but in reply to defense counsel's next question, "Was it shut *486 completely or left ajar?" he answered, "It was ajar." James also was certain that the officer did not tell him that he was looking for Phillip because he might have ingested cocaine. The trial judge never resolved these credibility questions, but such resolution is not necessary for us to decide this case.
There was also evidence to suggest that Officer Monteiro's recollections respecting the Castro house layout were not fully accurate. Nonetheless, the testimony respecting the observation of what appeared to be Phillip's swallowing a package containing a substance reasonably believed to be cocaine, and receipt of information, whether true or not, that Phillip had been using cocaine in school that morning, was uncontested. So, too, was the testimony that Monteiro responded and acted with great dispatch once he came on duty, and that he immediately summoned an ambulance when he found Phillip.
In his findings, the trial judge accepted the truth of Belz's initial observations in the boys' room, Phillip's flight after apparently swallowing what was in his hand, and the fact that Phillip was thought to live at 208 Regina Street,[1] so that Officer Monteiro went there first to find him. Although recognizing that the State's position respecting the warrantless arrest and intrusion into the Castro home beyond its entrance foyer was based upon a possible medical emergency, the trial judge concluded that there was insufficient evidence "to convince me that the officer had any reasonable basis from which to infer that there was in fact the danger that this young man was going to die from the ingestion of that particular piece of paper." He then found that "there was no reasonable basis from which the officer could infer that [Phillip] would have been at this house other than the fact that the computer terminal at the school said this was his home address."
*487 Based on these findings, the trial judge distinguished this case from State v. Leandry, 151 N.J. Super. 92, 376 A.2d 574 (App.Div. 1977), certif. den., 75 N.J. 532, 384 A.2d 511 (1977), apparently reading our decision there to require nothing less than actual observation of an imminent danger of death, and certainty, based on visual observation, of the presence of the endangered person in the house being entered.
We note first that neither of the two pillars of the trial judge's opinion were based upon his assessment of credibility, or upon findings as to objective facts. The judge's ruling was based partly on his assessment of the law as applied to facts which he found, and partly on his evaluation of the import of conceded facts.
As to the latter, we differ as to the lack of reasonable basis for believing that Phillip would be at the house which school records indicated was his place of residence. First, it had been his place of residence until as recently as the previous month. Second, it was only two or three blocks from the school, and it was reasonable to infer (as Officer Monteiro did) that a fleeing student who had probably swallowed a bag of cocaine would make that his initial destination. Next, when human movements and noises were detected in the house following assurances by Phillip's 19-year old cousin that no one else was there, it was not unreasonable to suspect that they were generated by Phillip. Significantly, Monteiro made no efforts to search any part of the house for contraband, nor indeed any effort to search the house for Phillip, other than to respond directly to the specific area where human movement was discerned, and where Phillip was then actually observed.
The sole legal question then is whether there was sufficient exigency created by the information imparted at the school to justify immediate action by Monteiro, as distinct from retreating and initiating warrant procedures.
We hold that there was a reasonable basis to believe that this 18-year old student had been using cocaine at school, and that *488 he had also probably swallowed an unknown amount of cocaine before fleeing from school. There was a visual observation by Belz, substantially confirmed by the second participating student whom he observed. Although not specifically found or rejected as a fact by the trial judge, there was nothing to dispute Officer Monteiro's testimony that his prime concern was not to arrest a suspected drug possessor, but to insure the physical safety of an 18-year old who was thought to have ingested a package containing an unknown quantity of cocaine. Supporting this uncontested testimony is the conceded fact that the officer immediately summoned an ambulance, not backup police, and that Phillip was taken to the hospital for examination, not to the police station for booking.
A police officer with drug arrest experience does not need a physician to be aware that the probability of ingestion of an unknown quantity of cocaine by mouth poses an immediate medical danger of unknown severity, which varies depending upon the substance, its purity and quantity, and the susceptibility of the person involved. Anyone who reads newspapers or watches television has to be aware of this kind of danger, not to mention a police officer who has received 40 hours of narcotics instruction and participated in 50 to 100 narcotics arrests. As former Chief Justice (then Judge) Burger observed in Wayne v. United States, 318 F.2d 205, 212 (D.C. Cir.1963), cert. den., 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963), there is in cases like this a "balancing of interests and needs." "When policemen, firemen or other public officers are confronted with evidence which would lead a prudent and reasonable official to see a need to act to protect life or property, they are authorized to act on that information, even if ultimately found erroneous." Id. What gives rise to genuine exigency is, "[t]he need to protect or preserve life or avoid serious injury ..." Id.
We see nothing in Leandry, supra, 151 N.J. Super. 92, 376 A.2d 574, to support the trial judge's holding that an officer's reasonable belief of medical exigency requires a showing that imminent death is probable, and there is near certainty as to the *489 presence of the person at risk in the premises. The exigency test may also be met by a prudent and reasonably based belief that there is a potential medical emergency of unknown dimension. As stated in Wayne, at 212:
[f]ires or dead bodies are reported to the police by cranks where no fires or bodies are to be found.... But the business of policemen and firemen is to act, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process. (Emphasis original).
See also Leandry, 151 N.J. Super. at 96, 376 A.2d 574.
Here, the officer already knew that Phillip was of a mind to flee, not to seek aid. Monteiro's immediate summoning of an ambulance could have turned out to be unnecessary, but it could have just as easily been a life-saving effort. We are not impressed with the arguments made to us that the initial delay in police response belies the presence of any exigency. Here, Officer Monteiro acted rapidly and professionally as soon as he came on duty and was dispatched. If anything, the earlier delay only made more urgent his mission if Phillip had indeed ingested a bag full of cocaine as indicated by the available information.
It is far easier to turn away from trouble than to steer into it. We can think of nothing more likely to chill diligent police efforts to preserve life than to here require proof of actual danger of death and certainty of location to justify the limited and focused incursion made in the present case. Monteiro acted only after the human noises coupled with James' statement that no one else was in the house made it likely that someone was hiding or being concealed in the stairwell. In the circumstances, considering the officer's reasonable belief that he was at Phillip's place of residence, the flight and the proximity to the school, it was reasonable to believe that the someone was Phillip.
Although the issue is moot in light of our holding, we agree with the trial judge that while there was also probable cause to arrest Phillip, this alone would not have justified a *490 warrantless arrest or entry by police. Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).
We reverse the grant of defendant's suppression motion as the State has established exigency to our satisfaction on these facts. The matter is remanded for trial accordingly.
NOTES
[1] Phillip's uncle and cousin testified that Phillip had lived there until October 1987, one month before the incident.