270 N.J. Super. 31 (1994)
636 A.2d 541
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
LAWRENCE GARLAND, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted October 5, 1993.
Decided January 14, 1994.
*34 Before Judges STERN, KEEFE and BILDER.
Zulima V. Farber, Public Defender of New Jersey, attorney for appellant (Ruth Bove, Assistant Deputy Public Defender, on the brief).
Andrew K. Ruotolo, Jr., Union County Prosecutor, attorney for respondent (Ralph G. Sullivan, Assistant Prosecutor, of counsel and on the brief).
The opinion of the court was delivered by KEEFE, J.A.D.
Defendant Lawrence Garland was indicted for the following crimes: count one  third degree possession of cocaine in violation of N.J.S.A. 2C:35-10(a)(1); count two  second degree possession of cocaine, in a quantity of half an ounce or more, with intent to distribute in violation of N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(2); count three  third degree possession of cocaine in violation of N.J.S.A. 2C:35-10(a)(1); count four  first degree possession of cocaine, in a quantity of five ounces or more, with intent *35 to distribute in violation of N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(1); and count five  third degree possession of cocaine with intent to distribute within 1,000 feet of school property in violation of N.J.S.A. 2C:35-7. Co-defendants Cassandra Garland and Melanie Higginbotham were also charged under counts three, four and five.
Counts one and two related to evidence seized from defendant's person, from the interior of the car he was operating, and from the trunk of the car, in the City of Newark on August 15, 1989. Counts three, four and five related to evidence seized from a motel room in the City of Linden during the early morning hours of August 16, 1989.
A motion to suppress the evidence obtained from both searches resulted in the trial judge granting the motion as to the evidence seized from the trunk and denying the remainder of the motion.[1]
Thereafter, pursuant to a plea agreement, defendant pled guilty to third degree possession of cocaine (count one), first degree possession of cocaine with intent to distribute (count four), and third degree possession of cocaine with intent to distribute within 1000 feet of school property (count five). Counts two and three were dismissed. Defendant preserved his right to appeal from the denial of his suppression motion.
Defendant was sentenced on count one to a five year term of imprisonment. On count four, the judge imposed a 15 year prison term with a five year period of parole ineligibility. On count five, the judge imposed a five year prison term with a three year period of parole ineligibility. The sentences were ordered to be served concurrently.
Defendant appeals and presents the following issues:
POINT I THE EVIDENCE SEIZED SHOULD HAVE BEEN SUPPRESSED AS IT WAS SEIZED IN VIOLATION OF DEFENDANT'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS.

*36 A. The pat-down search of defendant was illegal because Officer Rosania had no reasonable basis to believe defendant was armed and dangerous.
B. The trial court erred in upholding the warrantless search of Room 2212 at the Swan Motel based on the "exigent circumstances" exception to the warrant requirement.
C. The evidence seized from the Swan Motel must be suppressed as "fruit of the poisonous tree."
On August 15, 1989, at approximately 11:45 p.m., Newark police officers Anthony Rosania (Rosania) and Dennis Tassie (Tassie) were on routine patrol, travelling north in the lefthand lane of the Route 21 viaduct approaching Newark. It was at this point that the officers spotted a vehicle with a rental insignia on its rear bumper driving ahead of them in the righthand lane. The rental insignia aroused some suspicion in the officers because it is not uncommon for rental cars to be used by drug dealers. As the officers attempted to pull alongside, the vehicle abruptly changed from the righthand to the lefthand lane in front of the officers. The vehicle made this lane change without using its left directional signal. Rosania felt that the driver of the car had intentionally cut in front of the police vehicle because the driver did not want the officers to look inside his vehicle. To that point, the officers had only noticed one person, the driver, in the car.
The officers continued to follow behind the vehicle without their overhead lights on until the vehicle made a full stop at a traffic light. The officers pulled their car alongside the vehicle, and noted that the driver was a black male, approximately 40 years old, who was later identified as the defendant, Lawrence Garland. Moreover, the officers for the first time noticed a small light-skinned girl, approximately seven years old, who was later identified as B.V., slouched down in the passenger seat. While still in the police car, the officers inquired as to the ownership of the vehicle. The defendant responded that the car belonged to a friend. Concerned about the child's presence in the vehicle, Rosania asked the defendant who the child was. Defendant responded that the child was a friend of his. Rosania characterized defendant's response as "arrogant." Rosania again asked "who the child was," but defendant was not able to give the child's *37 name. Moreover, while defendant stated that he was taking the girl to her mother's house on West Kinney Street, he did not know the exact address.
Based on the improper lane change, and out of concern for the young passenger, Rosania instructed defendant to pull his vehicle over to the curb. Defendant could not produce a driver's license, and Rosania noticed an open can of beer between defendant's legs. Defendant was asked to exit his vehicle.
Upon defendant's exit from the vehicle, Rosania noticed a brown paper bag protruding about three-quarters of an inch to an inch above defendant's belt buckle. Rosania testified on cross-examination as follows regarding the bag:
As he stepped out of the car I carefully observed him and I noticed that bulging in his waistband right about where his buckle was. And after realizing he had something there, I tried to identify what it was and then I frisked him further.

....
Q. Officer Rosania, when you asked Mr. Garland to get out the car and you saw a bag, what did you think it was, sir?
A. I didn't know.
Q. What did you think it was?
A. Could have been any number of things.
Q. Did you have any suspicions about it?
A. No. It's something I felt I had to check, could be something that size, could have amounted to any sort of item.
Q. But nothing specific?
A. No. You can't know.
After checking the contents of the bag and finding drugs, defendant was placed under arrest and advised of his Miranda rights. He was handcuffed and placed in the back of the police car.
Rosania then had a conversation with B.V.B.V. told Rosania that the defendant was her mother's friend, but she did not know his name. B.V. also told Rosania that she had been at a birthday party that lasted a couple days, that her mother had left the party long before she had, and that she was on her way home to West *38 Kinney Street when she and defendant were pulled over. The girl indicated that the party was at the Swan Motel in Linden. B.V. also indicated that there were other people still at the motel.
The officers then called for backup, at which point Detectives Avalone and Ctnar responded. Upon their arrival, Rosania informed Avalone and Ctnar of his findings.
Avalone questioned defendant, who told him that he was staying at the Benedict Hotel in Linden. Avalone next had a discussion with Ctnar, who had just been talking to B.V. Ctnar informed Avalone that B.V. told him that she had not seen her mother for two days, and that she (B.V.) was staying at the Swan Motel. Avalone was familiar with the Swan Motel: it had a reputation for prostitution. Moreover, B.V. told Ctnar that two children were still at the motel room, and "they were left there alone."
Based on Ctnar's conversation with B.V., Avalone determined that defendant may have lied about where he was staying. Avalone then asked defendant whether he could confirm that he was staying at the Benedict Hotel. Defendant responded that he had a room key. A room key card bearing only the number "2212" was found on defendant's person. Avalone testified that he decided to proceed to the Swan Motel because he believed, in view of B.V.'s statements and the inconsistency in the versions as to where they had been, that the children were in danger.
Upon arriving at the Swan Motel at approximately 1:15 to 1:30 a.m., Avalone showed the key card obtained from defendant to the front desk clerk, who stated that the card was the key to room number 2212. Avalone testified that this made him "scared for the kids" that were allegedly in the room, because defendant had lied about the card being a room key for the Benedict Hotel. The detectives went directly to room 2212.
When they arrived at the room, Avalone knocked on the door and said "police." There was no answer. Avalone tried again, but again there was no answer. Avalone could hear that people were talking inside, but he could not determine what the voices were *39 saying, or whether the voices belonged to men, women or children. At that point, Avalone, who testified that he was "really concerned for the kids," put the key card in the door, opened it, and went inside. The first thing he saw was two ladies sitting at a table located in an outer room directly to the left of the door. The detective did not see any children, but the interior of the bedroom could not be seen from the doorway. The detectives walked by the women and into the bedroom where they saw two children lying fully clothed and motionless on the bed. They entered the bedroom to check the children's condition. While in the bedroom, the detectives noticed "a lot of narcotics and narcotics paraphernalia" on the dresser in front of the bed. The detectives seized 75 grams of cocaine, 482 vials of cocaine, and $1,801. The children, who, to Avalone, appeared unharmed, were ultimately taken to a relative's house, while the women, co-defendants Cassandra Garland and Melanie Higginbotham, were placed under arrest.
At the suppression hearing testimony was elicited from Rosania, Avalone, the defendant, B.V. and Tracy Morgan-Melamed, an investigator assigned to the Child Abuse Unit of the Essex County Prosecutor's Office. The judge found that the testimony of both Rosania and Avalone was credible, that the testimony of defendant was incredible, and that the testimony of B.V. was "suspect at best."
The judge found that the investigatory stop was legal pursuant to the articulable suspicion created by the traffic violation. The judge also found that ordering the defendant out of the car was valid based on the same reasons that justified the stop, in combination with the fact that the defendant did not have a driver's license and was driving with an open can of beer. Next, the judge upheld the pat-down of defendant and search of the bag in his waistband as a valid search for weapons.
Finally, relying on State v. Castro, 238 N.J. Super. 482, 570 A.2d 40 (App.Div. 1990), the judge determined that the warrantless search of the motel room was valid because a "genuine exigency" existed which justified the warrantless search of the hotel room *40 for the children who were allegedly there alone. Because the detectives were appropriately in the room, the judge found that the drugs seized from the bedroom were admissible because they were in plain view.

I
A search performed without a warrant is prima facie unreasonable unless it falls under one of the judicially accepted exceptions to the warrant requirement. State v. Bruzzese, 94 N.J. 210, 218, 463 A.2d 320 (1983), cert. denied, 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984). See also State v. DeLorenzo, 166 N.J. Super. 483, 487-88, 400 A.2d 99 (App.Div. 1979) (setting forth the five recognized exceptions to the warrant requirement in New Jersey). One of the exceptions is a search for weapons, or, as it is more commonly known, the "stop and frisk." Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Thomas, 110 N.J. 673, 542 A.2d 912 (1988). However, although the stop and frisk is a viable exception to the warrant requirement, the scope of the exception is limited to the safety of the detaining officer and those around him. As the Terry Court articulated:

The sole justification of the search ... is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.
[Terry v. Ohio, supra, 392 U.S. at 29, 88 S.Ct. at 1884, 20 L.Ed.2d at 911 (emphasis added).]
See also State v. Lund, 119 N.J. 35, 45, 573 A.2d 1376 (1990) ("The search is judged by whether a reasonably prudent person would be warranted in the belief that his or her safety or that of others was in danger.").
The mechanics of the stop and frisk are set forth in Terry, which the New Jersey Supreme Court has adopted through State v. Thomas, supra, 110 N.J. 673, 542 A.2d 912. As to the "stop" component of the stop and frisk, Terry provides that, absent grounds for arrest, an officer may nonetheless undertake an investigatory stop of a suspect when he or she can "point to *41 specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the stop. Terry v. Ohio, supra, 392 U.S. at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906. Probable cause, however, is not necessary. Id. at 22, 88 S.Ct. at 1880, 20 L.Ed.2d at 907; State v. Casimono, 250 N.J. Super. 173, 178, 593 A.2d 827 (App.Div. 1991), certif. denied, 127 N.J. 558, 606 A.2d 370 (1992), cert. denied, ___ U.S. ___, 112 S.Ct. 1978, 118 L.Ed.2d 577 (1992).
Once the officer has made a legal investigatory stop, Terry instructs that the officer may, for purposes of his or her protection, search the suspect for weapons:
[We] conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime.
[Terry v. Ohio, supra, 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909 (emphasis added).]
The Court emphasized that the officer's belief that he or others may be in danger must be judged by an objective standard:
The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.... And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.
[Ibid. (citation omitted).]
See Sibron v. New York, 392 U.S. 40, 64, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917, 935 (1968) ("In the case of the self-protective search for weapons, [the officer] must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous.") (emphasis added); State v. Thomas, supra, 110 N.J. at 683, 542 A.2d 912 ("[A] specific and particularized basis for an objectively reasonable suspicion that defendant was armed and dangerous[]" must exist for the weapons search to be legal.) (emphasis in original).
It is critical to recognize that the "stop" and the "frisk" require two separate inquiries: the facts that allow the detaining *42 officer to make a stop do not automatically permit that officer to search for weapons. While the right to search may flow from the same set of facts that permitted the stop, "in situations where ... the officers have no prior indication that the suspect is armed, more is required to justify a protective search." Id. at 680, 542 A.2d 912. In other words, when an officer makes a stop based on circumstances that do not objectively cause him to believe that a suspect is armed and dangerous, some event must occur between the stop and the weapons search which leads to the objective belief that the suspect is armed and dangerous.
While Terry was decided in the context of an officer who conducted a stop and frisk of two suspects who were on foot, its principles are equally applicable in the context of an automobile stop. See e.g., State v. Lund, supra, 119 N.J. 35, 573 A.2d 1376. While every motor vehicle stop does not implicate a search for weapons, Michigan v. Long, 463 U.S. 1032, 1049 n. 14, 103 S.Ct. 3469, 3481 n. 14, 77 L.Ed.2d 1201, 1220 n. 14 (1983), an officer may order persons out of an automobile during a stop for a traffic violation, and may frisk those persons for weapons if there is a reasonable belief that they are armed and dangerous. Pennsylvania v. Mimms, 434 U.S. 106, 109-10, 98 S.Ct. 330, 332-33, 54 L.Ed.2d 331, 336 (1977). See also State v. Lipski, 238 N.J. Super. 100, 103, 569 A.2d 272 (App.Div. 1990) ("[O]nce the occupant is out of the vehicle, the propriety, in constitutional terms, of the officer's pat-down and frisk is to be determined by the standards described by Terry v. Ohio, ... namely, the officer's belief that the occupant presents a threat to his safety.").
Applying the above stated principles to this case, the first inquiry to be made is whether, under the totality of the circumstances, there was articulable suspicion to make the original stop. Terry v. Ohio, supra, 392 U.S. at 10, 88 S.Ct. at 1874, 20 L.Ed.2d at 899; State v. Davis, 104 N.J. 490, 504, 517 A.2d 859 (1986). The record supports the trial judge's conclusion that the original stop, in which Rosania and Tassie directed defendant to pull over, was justified. Defendant committed a motor vehicle violation by *43 failing to signal while changing lanes, and his statement concerning the ownership of the vehicle was inconsistent with the rental insignia on the rear bumper. This gave the officers the right to make an investigatory stop to examine a driver's license and registration. Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); State v. Lund, supra, 119 N.J. 35, 573 A.2d 1376. Moreover, the request to exit the vehicle was also valid. Pennsylvania v. Mimms, supra, 434 U.S. at 109-10, 98 S.Ct. at 332-33, 54 L.Ed.2d at 336. See State v. Nittolo, 194 N.J. Super. 344, 346, 476 A.2d 1253 (App.Div. 1984) (following Mimms).
However, the record does not permit the same result under the second Terry inquiry. Clearly, this case does not fall within the group of cases in which the right to search flows from the same set of facts that permitted the stop. There is nothing in the record to indicate that the traffic violation, or anything that happened thereafter, caused the officers to believe that the driver of the car was armed and dangerous. At no point in the record does Rosania ever affirmatively state that he believed his safety was in danger. He did not indicate that he thought the bag contained a weapon, or that the bag made him fear for his safety.
The record indicates that upon noticing the bag in defendant's pants, Rosania first searched defendant for weapons before he took the bag out and examined it. Searching the rest of defendant's body before actually reaching for the bag indicates that Rosania did not believe the contents of the bag posed a threat to his safety.
The State argues that the officer never "disregarded [his] own safety" during his encounter with defendant. Certainly, an officer is never expected to disregard his own safety. However, a particularized fear that the detained party is armed and dangerous is required in order for the officer to be able to search the party under State v. Thomas, supra.
An officer cannot simply assume that everyone is armed and dangerous until proven otherwise. Instead, Terry and Thomas *44 require that the officer point to particular facts which show that defendant is dangerous. Indeed, if everyone is assumed to be armed and dangerous until the officer is satisfied that he or she is not, then officers would be able to frisk at will  a result not contemplated by the Fourth Amendment or the New Jersey Constitution. See State v. Lipski, supra, 238 N.J. Super. at 104, 569 A.2d 272 (evidence obtained pursuant to pat-down search suppressed when officer had no reason to believe that defendant was armed or dangerous).

II
The drugs seized from the motel room were undoubtedly in plain view. However, the critical question to be answered is whether the officers had the right to be in that position to observe the narcotics without a warrant. The trial judge justified the officers' presence in the motel room without a warrant under the "emergency aid" doctrine, specifically relying upon State v. Castro, supra, 238 N.J. Super. 482, 570 A.2d 40. The doctrine is recognized as a exception to the warrant requirement. See, Wayne R. LaFave, Search & Seizure, A Treatise on the Fourth Amendment § 6.6(a) (2d ed. 1978). Three elements must be satisfied in order to justify a warrantless search under the emergency aid doctrine:
[T]here must be (1) the existence of an emergency as viewed objectively (2) a search not motivated by a desire to find evidence and (3) a nexus between the search and the emergency.
[State v. Scott, 231 N.J. Super. 258, 275, 555 A.2d 667 (App.Div. 1989) (Ashbey, J.A.D., dissenting), rev'd on dissent, 118 N.J. 406, 571 A.2d 1304 (1990).]
We conclude that all three elements have been satisfied in these circumstances.
First, it is generally recognized that the emergency aid doctrine applies where police officers have reason to believe that unattended children require their assistance. See LaFave, supra, § 6.6(a) at 703. Indeed, leaving children unattended constitutes a substantial threat to their welfare and safety and is recognized as grounds for criminal prosecution in this State. State v. M.L., 253 N.J. Super. 13, 600 A.2d 1211 (App.Div. 1991), certif. denied, 127 *45 N.J. 560, 606 A.2d 371 (1992) (Conviction for endangering the welfare of a child, N.J.S.A. 2C:24-4a, upheld where defendant mother left her 15 month old child unattended for over four hours and made no provisions for the child's supervision or feeding in mother's absence.). Moreover, the warrantless entry into premises for the purpose of protecting a child under circumstances where it was reasonable to believe the child was unattended was not even questioned in State v. M.L., supra.
Here, the police officers learned from B.V. that she had been at a birthday party at the motel, that she had not seen her mother for two days, and that two other children were still at the motel and were left there alone. Further, Detective Avalone knew, from his work as a police officer, that the motel in question had a reputation for prostitution. Clearly, those facts created an objective basis for proceeding to the motel without a warrant to inquire further into the children's welfare. See People v. Sutton, 65 Cal. App.3d 341, 134 Cal. Rptr. 921 (1977) (Police justified in responding to apartment at 2:00 a.m. on report that small children were left alone.).
Second, the trial judge was satisfied that the entry into the motel room was not motivated by a desire to find evidence. The judge determined that Detective Avalone's testimony was credible, and that he went to the motel for the purpose of safeguarding the children. That finding of fact is amply supported by the record and, thus, is unassailable on appeal. State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964).
Finally, there was a nexus between the search and the emergency. When the police arrived at the motel room, Detective Avalone knocked on the door and said "police." There was no answer. Avalone tried again, but again there was no answer. The detective could hear that people were talking inside, but he could not determine what the voices were saying, or whether the voices belonged to men, women or children. At that point, Avalone inserted the key card in the door and opened it. When he entered the motel room, he saw two women sitting at a table. *46 The women said nothing, and the officers did not see the children. The detectives entered the bedroom for the purpose of ascertaining the whereabouts and condition of the children. While in the bedroom, the detectives noticed the narcotics in plain view on the dresser in front of the bed.
Although the police initially responded to the motel room because they feared the children were in danger for lack of supervision, the presence of the two women in the room was not sufficient in itself to alleviate their concerns. The failure of the women to respond to the police officers' announcement of their presence created a sufficiently ambiguous atmosphere to justify the officers, upon entry, to proceed to the bedroom to assure themselves that the children were unharmed. See United States v. Barone, 330 F.2d 543 (2d Cir.), cert. denied, 377 U.S. 1004, 84 S.Ct. 1940, 12 L.Ed.2d 1053 (1964) (Where entry was made into an apartment because of screams emanating from it late at night, and the two persons encountered there could give no reason for the screams other than that one of them may have been having a nightmare, investigating officer properly entered another room for the purpose of completing the investigation.); United States v. Booth, 455 A.2d 1351 (D.C.App. 1983) (Where officer responded to radio report of assault, and person answering the door with blood on nose did not respond to inquiry why or how such condition existed, it was proper for police to enter premises.). See also State v. Castro, supra, 238 N.J. Super. at 485-489, 570 A.2d 40 (Officer did not exceed scope of justified exigent entry when he went to an interior doorway in response to movements and noises after assurance from person who answered door that no one else was present.).
Thus, we affirm the Law Division judge's denial of defendant's motion to suppress the evidence obtained from the warrantless search of the motel room.

III
Finally, defendant contends that the evidence secured from the warrantless search and seizure of the motel room is the *47 product of the illegal pat-down search of defendant, and, therefore, must be suppressed as "fruits" of the initial illegal search. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); State v. Demeter, 231 N.J. Super. 114, 555 A.2d 30 (App.Div. 1989), aff'd, 124 N.J. 374, 590 A.2d 1179 (1991). Defendant points to the fact that the key card marked with the number 2212 on it was used to gain access to the motel room and was seized from him after his arrest resulting from the illegal search.
The contention is without merit. It must be remembered that the police officers who stopped the defendant were initially concerned about the welfare of the child in defendant's vehicle. For all intents and purposes, the illegal pat-down search of defendant, resulting in his arrest for possession of narcotics, terminated the police officers' interest insofar as defendant's drug violations were concerned. Their interest concerning the child's welfare was the continuing focus of police concern. That interest was highlighted and expanded when Detectives Avalone and Ctnar arrived at the scene and learned about the two unattended children at the motel.
Contrary to defendant's contention, the key card for the motel room was not seized from the defendant during the course of the illegal pat-down search. Upon Detective Avalone's arrival at the scene, defendant was given Miranda warnings. Thereafter, in response to Detective Avalone's questioning, which was based on his concern for the children, defendant said that he was staying at the Benedict Hotel. When Detective Avalone asked him if he had any proof of that, knowing that B.V. had told Ctnar that she had been at the Swan Motel, defendant volunteered that he had a room key card. The key card, therefore, was produced in connection with questioning on a subject matter having nothing to do with the drugs found during the illegal pat-down search.
The critical issue to be answered in such cases is "`whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiency distinguishable to be purged of the primary taint.'" Wong Sun v. United States, *48 supra, 371 U.S. at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455 (citation omitted). If police authorities "have obtained the evidence by means that are sufficiently independent to dissipate the taint of their illegal conduct[,]" the deterrent object of the exclusionary rule does not serve its purpose. State v. Johnson, 118 N.J. 639, 653, 573 A.2d 909 (1990).
The test to be applied to determine whether the taint has been dissipated requires an analysis of three factors:
(1) the temporal proximity between the illegal conduct and the challenged evidence;
(2) the presence of intervening circumstances; and (3) the flagrancy and purpose of the police misconduct.
[Ibid.]
In this case, the temporal proximity between the illegal pat-down search of defendant, and the interrogation leading to the production of the room key card was rather close in time and favors the defendant. However, as to the second factor, defendant's arrest for drug possession was an intervening circumstances of little significance to the police officer's primary interest, i.e., the welfare of B.V. and the two children in the motel room. We have no hesitancy in concluding that the interrogation regarding defendant's whereabouts prior to being stopped by the police and concerning B.V. would have occurred regardless of his arrest for drug possession. Lastly, we conclude that the police conduct in this case was not egregious. The search of defendant's person was not intrusive. The brown paper bag that was seized protruded about three quarters of an inch to an inch above defendant's belt buckle. It was not hidden from view in such a manner that it could be discovered only through a detailed search of defendant's body. None of defendant's garments were removed during the search. In sum, the officers' conduct was not flagrant or outrageous.
In conclusion, defendant's conviction and sentence on count one of the indictment is reversed. His conviction and sentence on counts four and five of the indictment are affirmed. The matter is *49 remanded for the purpose of entering an amended form of judgment in conformance with this opinion.
NOTES
[1] As such, the evidence discovered in the trunk is not part of this appeal.