775 A.2d 665

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. GARY N. FRANKEL, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued December 19, 2000—Decided July 2, 2001.

Before Judges STERN, COLLESTER and FALL.

*Mary R. Juliano*, Assistant Prosecutor, argued the cause for appellant (*John Kaye*, Monmouth County Prosecutor, attorney; *Ms. Juliano*, of counsel and on the brief).

*William H. Buckman*, argued the cause for respondent.

The opinion of the court was delivered by

COLLESTER, J.A.D.

Pursuant to leave granted, the State appeals from an order of the Law Division granting defendant's motion to suppress evidence. We reverse.

On December 28, 1999, a Monmouth County Grand Jury indicted defendant, Gary Frankel, on charges of possession of marijuana in the fourth degree, contrary to the provisions of *N.J.S.A.* 2C:35–10a(3), and operating a marijuana production facility, a crime of the first degree, contrary to the provisions of *N.J.S.A.* 2C:35–4.

Defendant filed a motion to suppress evidence. The salient facts testified to at the suppression hearing are that on June 21, 1999, at 7:26 a.m. Freehold Township Police Dispatcher Darling Ecko received a 9–1–1 call from the phone line of 732–625–0590. When Ecko answered the phone, no one was on the line, and all she heard was static. She described such a call as an "open line" call and related that during her early morning shift she had received three other open line 9–1–1 calls from two other residences: one at 12:20 a.m.; one at 3:05 a.m.; the other at 7:06 a.m. When the 7:27 a.m. call came from defendant's phone line, Ecko exclaimed on the tape monitoring the call: "This is ridiculous. It's three separate residences in the town. I've never had this happen before. Hello?"

Ecko dispatched Patrolman Russell Gelber to check out the open line call at 175 Siloam Avenue, the address shown on her computer screen for the origin of the call. Gelber arrived at the address within ten minutes. He saw no vehicles outside and at first thought that the house was empty. A white sheet behind the screen door blocked the view inside.

After Gelber knocked, the defendant looked out from behind the sheet. Gelber told him that a 9–1–1 call had been made from the residence and that no one was on the line when the call was answered. Defendant replied that he made no such call. When Gelber asked if someone else could have made the call, the defendant said that he lived alone.

Gelber testified that the defendant was extremely nervous and was tripping over his words, which in turn made Gelber nervous since he could not see what, if anything, the defendant was doing behind the sheet. He asked the defendant to step outside the house and patted him down for weapons, finding nothing. Gelber then asked if he could step inside the residence to make sure everything was all right. Defendant refused to permit entry and repeatedly denied making the 9–1–1 call. He added that he was a computer consultant and that the 9–1–1 call must have been a computer error. Gelber said the defendant seemed "totally shocked" at his suggestion that he enter to make sure that no one was in trouble. Defendant started to panic, asked whether he needed a lawyer, and said that Gelber could not enter without a search warrant.

Gelber said that never before had anyone refused him entry when he responded to a 9–1–1 call. Along with defendant's anxiety the denial by defendant led Gelber to fear that someone inside was in danger. Accordingly, he called for backup.

While he waited, Gelber told defendant that the 9–1–1 call had been traced to his residence. Defendant confirmed the phone number and suggested that since he was on the computer earlier that morning, the computer may have inadvertently dialed 9–1–1. To check out that possibility, Gelber called the dispatcher and asked her to call the number of the 9–1–1 call. While waiting for the result, Gelber asked whether there was something inside the house that defendant did not want him to see. Defendant said there was some "sexual stuff" and that he was embarrassed about it.

The dispatcher called Gelber back and told him that the phone line in question was busy, which made Gelber even more concerned that someone was in the house needing assistance. The defendant said he would go inside to show the officer that the phone was operational and not being used. He allowed Gelber to step into the foyer, and Gelber next saw the defendant run down the hallway out of sight. Within seconds he reappeared with two

cordless phones. He was speaking to his mother on one, telling her that the police wanted to enter his house. Defendant then hung up and used one cordless phone to call the number which was traced to the 9–1–1 call, the other cordless phone rang. Gelber then told defendant that the demonstration only showed that the phone line was in working order, but it still did not explain either the 9–1–1 call or the subsequent busy signal.

At this point, Officer Dean Smith arrived as Gelber's backup was briefed on the situation. Gelber told Smith that he was not satisfied with the defendant's explanation, was concerned by defendant's agitated behavior and believed that someone in the residence might need help. He then told defendant that they were going to walk through the residence to make sure that there was no one inside the residence in need of assistance. He added that he would not look in any drawers or check any of defendant's personal property.

The officers entered, walked into rooms and opened closets. In one closet Gelber saw a tray of marijuana. He arrested defendant and left him with Officer Smith while continuing to walk into remaining rooms. In the bathroom he saw a terrarium of marijuana in plain view. While walking to the basement, he smelled raw marijuana and saw an elaborate water system with several grow lights and marijuana plants. No other person was in the house. Defendant was taken to police headquarters, and a search warrant was issued for the residence.

Defendant testified that he was in his kitchen when Gelber knocked at his door. He admitted being anxious, fearing that the officer was there to tell him of a family tragedy or accident. He said he was shocked and humiliated when Gelber patted him down on his front stoop and quoted Gelber as saying he wanted to enter "to look for bodies." According to defendant, there was nothing he could tell the officer to prevent him from invading his privacy.

Dispatcher Ecko testified that during the 11:00 p.m. to 8:00 a.m. shift on June 21, 1999, a few 9–1–1 calls were received during the night. She said that when a phone call comes from a residence,

the name of the phone subscriber and the residence appears on her computer screen. The standard procedure was to dispatch an officer to investigate all open 9–1–1 calls. She said that she had not told Gelber of the three other open line 9–1–1 calls that evening when she dispatched him to the defendant's residence.

Robert Bulthraupt, an expert witness employed by Bell Atlantic as a Team Leader for a 9–1–1 control center, testified as to a number of situations where non-human 9–1–1 calls were generated, such as from phones with low batteries, answering machines, technician line errors and computer modems. He opined that technical problems resulted in "false" 9–1–1 calls of up to five percent of those received by dispatchers.

Defendant's phone records disclosed that his computer dialed out on the 732–625–0590 line via modem at 7:26 a.m., the exact time that the 9–1–1 call was received by Ecko. The motion judge thereby concluded that defendant did not deliberately make a 9–1–1 call, and the State does not dispute that conclusion.

The motion judge implicitly found the testimony of Patrolman Gelber credible, specifically finding that Gelber was unaware of any prior open line 9–1–1 calls, that he felt defendant's manner was anxious, that he sought to enter the house for a "walk-through" for the purpose of determining if anyone was in need of assistance, and that he called the dispatcher to request a follow-up call to the house phone which resulted in a busy signal. Nonetheless, the motion judge held that the State did not set forth sufficient proof of probable cause of "exigent circumstances" to justify the warrantless search.

On appeal the State does not argue the exigent circumstances exception for a warrantless search but rather that the actions of the officers entering into defendant's home were justified by the community care-taking function of police to enter and investigate reports of an emergency. *See State v. Scott,* 231 *N.J.Super.* 258, 274–75, 555 *A.*2d 667 (App.Div.1989) (Ashbey, J., concurring and dissenting), *rev'd,* 118 *N.J.* 406, 571 *A.*2d 1304

(1990); *United States v. Barone,* 330 *F.*2d 543, 545 (2nd Cir.), *cert. denied,* 377 *U.S.* 1004, 84 *S.Ct.* 1940, 12 *L.Ed.*2d 1053 (1964). This right of entry is to be distinguished from the police activity of investigating and accumulating evidence relating to violations of criminal law. *State v. Navarro,* 310 *N.J.Super.* 104, 108, 708 *A.*2d 416 (App.Div.1998).

Under this so-called "emergency aid doctrine" the right of police entry is separate and apart from the question of whether there is probable criminal activity within the premises. *See State v. Leandry,* 151 *N.J.Super.* 92, 96, 376 *A.*2d 574 (App.Div.1977). As with medical emergency units, fire departments and other emergency workers, police response to an emergency is not encumbered by a need for judicial approval and issuance of a warrant before action may be taken. Where there is a reasonable belief that someone is in need of immediate aid, the police may enter premises and investigate without a warrant to the extent necessary to quell that fear, in light of the nature of the perceived emergency. Any contraband or evidence of a crime observed in plain view may be seized without regard to probable cause. *See, e.g., State v. Hill,* 115 *N.J.* 169, 173, 557 *A.*2d 322 (1989); *State v. Garland,* 270 *N.J.Super.* 31, 44–46, 636 *A.*2d 541 (App.Div.1994); *State v. Castro,* 238 *N.J.Super.* 482, 487–89, 570 *A.*2d 40 (App.Div. 1990).

To justify a warrantless search under the emergency aid doctrine the State must satisfy the following three-pronged test: (1) there must be a reasonable and objective basis to believe that an emergency exists; (2) the resulting search must not be motivated by a desire to find evidence of a crime; and (3) there must be a nexus between the search and the emergency. *See Garland, supra,* 270 *N.J.Super.* at 44, 636 *A.*2d 541; *Scott, supra,* 231 *N.J.Super.* at 275, 555 *A.*2d 667.

The United States Supreme Court defined the emergency aid exception to the warrant requirement as follows:

We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment

does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid ... The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. [Citations omitted.]

[*Mincey v. Arizona*, 437 *U.S.* 385, 392, 98 *S.Ct.* 2408, 2418, 57 *L.Ed.*2d 290, 300 (1978).]

9–1–1 is the simplest and most effective means for citizens to call for emergency police services. Public reliance upon the 9–1–1 system is great. The public policy of this State gives due recognition to 9–1–1 emergency calls and prompt police action. *See, e.g., N.J.S.A.* 52:17C–1 *et seq.; N.J.A.C.* 17:24–2.3 *et seq.* Common sense and experience illustrate the need for prompt and appropriate police action to 9–1–1 calls, even those that are open-ended.

Defendant acknowledges that a 9–1–1 call warrants a police response. However, he argues that because mechanical failures, computer "glitches" or the like generates a percentage of erroneous 9–1–1 calls, a probable cause standard is mandated to enter someone's home. We disagree. As stated by former Chief Justice (then judge) Burger in *Wayne v. United States,* 318 *F.*2d 205, 212 (D.C.Cir.), *cert. denied,* 375 *U.S.* 860, 84 *S.Ct.* 125, 11 *L.Ed.*2d 86 (1963):

[f]ires or dead bodies are reported to the police by cranks where no fires or bodies are to be found ... [b]ut the business of policemen and firemen is *to act*, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process. (Emphasis in the original.)

■ We hold that the possibility of computer error, fraud or false emergency reports in 9–1–1 calls is insufficient to suppress evidence observed in plain view during a police officer's entry in response to a perceived emergency when the officer has acted reasonably and prudently.

While no New Jersey case specifically applies the emergency aid doctrine to a 9–1–1 call, analogous case law supports its application. *See State v. Garbin,* 325 *N.J.Super.* 521, 739 *A.*2d 1016 (App.Div.1999), *certif. denied,* 164 *N.J.* 560, 753 *A.*2d 1153 (2000) (holding that police officers were justified in entering defendant's garage based on observations of smoke from the

garage and wheels of a truck rapidly spinning); *Navarro, supra,* 310 *N.J.Super.* at 109, 708 *A.*2d 416, (holding it permissible for a police officer to accompany a landlord into defendant's apartment to retrieve defendant's gun to protect the landlord and children from injury); *Scott, supra,* 231 *N.J.Super.* at 277, 555 *A.*2d 667 (finding that the emergency aid doctrine permitted a warrantless search in a domestic violence situation); *Leandry, supra,* 151 *N.J.Super.* at 96, 376 *A.*2d 574 (holding that the emergency aid doctrine permitted the warrantless search of a residence based on calls from an informant indicating that a person inside had been shot was recuperating. Officers observed a hospital bed inside the house, and a broken pane of glass in a door).

We do not hold that a 9–1–1 call relieves law enforcement of its constitutional obligations or dilutes individual Fourth Amendment rights. Searching inquiry must be made as to whether the action taken was pursuant to a reasonable and objective belief of an emergent situation as opposed to an attempt to obtain evidence of a crime and whether the resulting entry and search were properly circumscribed by the nature of the perceived emergency.

In the case at bar Officer Gelber acted reasonably and prudently when confronted with a situation of unknown dimension and risk. He did not force his way into the premises but called the dispatcher to further investigate his concern that someone else was inside despite defendant's denials. When a busy signal was reported on the same phone from which the 9–1–1 call emanated, it became the officer's obligation to determine if someone within was in distress. His actions were objectively reasonable, and his search of the premises was properly circumscribed by the nature of the perceived emergency. Therefore, the State satisfied all the requisite elements under the emergency aid doctrine to justify entry into defendant's house without a warrant, and the evidence observed in plain view was properly seized.

Reversed and remanded.