829 A.2d 1123 (2003)
362 N.J. Super. 600
STATE of New Jersey, Plaintiff-Respondent,
v.
John Kenny DILORETO, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued March 4, 2003.
Decided August 21, 2003.
*1125 Frank J. Pugliese, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Mr. Pugliese, of counsel and on the brief).
Joseph Connor, Jr., Assistant Prosecutor, argued the cause for respondent (Michael M. Rubbinaccio, Morris County Prosecutor, attorney; Mr. Connor, on the brief).
Before Judges STERN, COBURN and ALLEY.
*1124 The opinion of the court was delivered by STERN, P.J.A.D.
Pursuant to his guilty plea in a capital prosecution, defendant was convicted of purposeful or knowing murder, N.J.S.A. 2C:11-3a(1)(2) (count one), felony murder, N.J.S.A. 2C:11-3a(3) (count five), two counts of armed robbery, N.J.S.A. 2C:15-1a (counts two and three), and possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4a (count four). A jury could not reach a unanimous decision as to the penalty, and the trial judge merged the felony murder and possessory offense into the purposeful or knowing murder (count one) and sentenced defendant to life imprisonment with 63 3/4 years to be served before parole eligibility under the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2. He imposed a consecutive sentence of 20 years with 85% parole ineligibility for one armed robbery (count two) and 15 years with 85% before parole eligibility "concurrent to counts one and two" for the other.
On this appeal, defendant argues that his motion to suppress "the ammunition clip, gun and his statements to the police" subsequent to a "pat-down" of his person and "discovery of the ammunition clip" *1126 should have been granted.[1] He contends that there was no authority to order defendant, who had been reported as a "missing person," out of the car in which he was observed by the police, to "pat him down" thereafter or to enter his pants pocket without having felt a weapon, and, in any event, to enter his car where a nine millimeter handgun was located. He further argues that his statements at the scene relating to the ammunition clip in his pocket and the gun in the vehicle and a subsequent formal statement at headquarters about a prior murder were not admissible, that the "inevitable discovery doctrine" cannot be used to permit admissibility of the gun, that the NERA sentence for the murder is illegal, and that the consecutive maximum sentence for the armed robbery of the murder victim cannot stand. We affirm the conviction but vacate the NERA portion of the sentence for murder.

I.
At approximately 10:30 p.m. on April 9, 1998, the car defendant was driving was observed in the parking lot of a hotel in Fairfield, Essex County. It was parked on an angle with its engine running in a stall which caught the attention of a police officer while on routine patrol. Based on his knowledge of car thefts and attempted suicides in the lot, Officer Vincent Crapello ran the license plate number through his mobile data terminal ("MDT"). The MDT inquiry revealed that the last person authorized to drive the vehicle was reported as "missing."
According to the testimony of Officer Crapello at the motion to suppress:
A The alarm was for ait was attached to the vehicle, when I typed in the license plate it came back thatthe registered owner of the vehicle, but then the alarm sounded that a person who was last occupying that vehicle was listed in the computer [as] a missing person.
Q And how does the computer give you that information? How does it display it or otherwise convey it to you?
A The information is displayed on the MDT screen itself, on the computer screen.
Q And in this particular case what was it displaying?
A It had displayed the owner of the vehicle, the registration information regarding the vehicle, and then immediately following that said missing person EMD, endangered and it gave the particulars of the person that was in the wantin the hit.[2] *1127 Q Wasfirst of all, who was reported to you at that time as the registered owner?
....
A I'm sorry, it was owned by an Alberto E. Guzman (phonetic), residing at 7678 Market Street in Paterson.
Q Now was that or was that not the same person that the other information came across on?
A That was not.
Q And who was the other person identified?
A As John Kenny Diloreto.
Q And what information did the MDT provide you regarding him?
A That gave his name, his date of birth, Social Security number, the agency that reported him missing.
Q What agency was that?
A Jefferson Township Police Department.
Q And what else?
A Other various descriptors of the individual, his sex, race, height, weight, hair color, eye color.
Q And this information is visible to you on a screen in youron your laptop?
A Yes, sir.
As a result of the information received, Officer Crapello called for "a backup officer," and after Officer Richard Filipow arrived, Crapello described what occurred:
A I walked up to the driver's side of the vehicle from the rear. I shone shoneshined my flashlight into the car and I noticed an individual inside the vehicle.
Q And can you describe the individual you noticed inside the vehicle?
A It was a white male and he appeared to be sleeping at the time. He was reclining back in his seat with his head leaning to the left, either against the frame or on the seat of the vehicle.
Q Now at that point that you made that observation can you estimate for me how much time had passed since you had initially driven by the car and saw exhaust apparently coming out of the vehicle?
A It would have been approximately three-and-a-half, four minutes, somewhere thereabouts.
Q After you observed this individual in the vehicle what happened next?
A Officer Filipow had taken up a position on the right rear portion of the vehicle as aas a backup unit, as a cover unit. I attempted to open the car door, the door was locked. And at that point I knocked on the window to try to waken the person inside the car.
Q And what happened when you did that?
A After I knocked the person inside the car woke up.
Q And what happened next?
A He rolled down his window. I asked him for identification and he handed up his driver's license and Social Security card.
Q And did you examine these items?
A Yes, sir, I did.
....
Q And when you examined those documents what were they, what did they say?
A The names on the documents were the same name as the person shown on the NCI hit as the missing person.
Q And who was that again?
A That was John Kenny Diloreto.
Q After looking at this documentation that the driver handed to you and after examining it what did you do next?
A I was going to go back to my squad car to have headquarters confirm the want through Jefferson Township P.D.

*1128 Before I did that Officer Filipow came up, took up my position on the driver's side of the vehicle to keep his attention focused on the occupant of the vehicle. And once Officer Filipow got there I in fact returned to my squad car, notified headquarters to contact Jefferson P.D. to validate the hit.
While waiting for a response, Crapello decided to "secure" the individual "in the back of the patrol car until Jefferson ... g[o]t back to us one way or the other, whether or not he's actually wanted or not." According to Crapello:
A Again, I was sitting in the patrol car, we were waiting for a few minutes for Jefferson P.D.'s response and I had told Officer Filipow we're going to bring this guy out of the car and secure him in the back of the patrol car until Jefferson g[o]t backgets back to us one way or the other, whether or not he's actually wanted or not.
....
Q Now after you had made the determination to place him in the rear of your patrol vehicle, what happened next?
A Officer Filipow went over to the driver, asked him to step out of the car. He was pat-searched before getting into the back of the car for officer's safety. And as I witnessed, Officer Filipow patsearching the individual he asked the person who was being searched what the object was that he felt in his right front pocket.
Initially the individual replied I don't know, sir. And as Officer Filipow attempted to retrieve the item the person who was being searched said it's a clip, sir.
Q Now it was Officer Filipow who was conducting the pat-down you referred to?
A Yes, sir.
....
Q Now as this pat-down was being conducted, what did you observe happen?
A Again, Officer Filipow patted down the right side of Mr. Diloreto and as he reached the right front pant pocket he had asked Mr. Diloreto what's in your pocket and, again, he had stated that I don't know, sir.
Q What happened next?
A At that point Officer Filipow attempted to retrieve the item that was in the front pocket of Mr. Diloreto. And as that was being done Mr. Diloreto stated it's a clip, sir.
Q And when he said it's a clip, what did you understand thatwhat do you understand by the word clip?
A It's a magazine for a handgun.
Q What happened next?
A The clip was removed from his pocket. He was placed against the Toyota itself and he was handcuffed and asked immediately where is the gun. At that
Q Who asked him that, if you recall?
A Officer Filipow. And the immediateimmediate response by Mr. Diloreto was it's under the front seat, sir.
According to Crapello, "Officer Filipow went into the car in the area indicated by [defendant] under the front driver's seat, and retrieved a nine millimeter handgun."
Officer Filipow testified at the motion to suppress as to the "pat-down," and the inquiry on and discovery of the firearm as follows:
A We determined that it would be best to have the driver exit his vehicle and be brought back to the patrol vehicle until the situation could be sorted out.
Q As a result of that, what happened next?
A I asked the driver to exit the vehicle, which he complied, and then for officer's safety as well as his own safety I asked *1129 him to turn towards the vehicle so I could pat him down.
Q And how did you position him at that point?
A Again, I asked him to turn towards the vehicle and placed his hands on the roof of the vehicle.
Q And what did you do?
A At that point I began to pat him down and the first area I began to pat down was his front pocket, right front pocket.
Q And when you did that what happened?
A I felt like a large metal object in his pocket, it would be the right front pocket.
Q And when you felt that what did you do?
A I asked him what it was at that point.
Q And did he respond?
A Yes. He stated I don't know, sir.
Q Now what did this item feel like at that point?
A Again, it ran almost the length of the pocket and it felt like a very hard metal type object in the pocket.
Q Could you identify it just by feel at that point?
A No.
Q After he indicated to you that he didn't know what it was what happened next?
A I began to remove the item from his pocket and I asked him once again what it was, what the item was in his pocket.
Q And did he respond at that point?
A Yes. He stated it was a clip.
Q And what did you understand by the word clip in that context?
A A clip is referred to as ausually an ammunition magazine for a handgun or any type of ammunition magazine.
Q After he indicated that to you what happened next?
A Right about the same time as he indicated it waswhat the item was I had removed it from his pocket and visually saw that it was an ammunition clip.
Q And what did you do next?
A At that point for my safety as well as you know, Officer Crapello's safety, we determined to handcuff the suspect until we could complete the pat-down search offor the rest of his body.
Q And how did you handcuff himwho handcuffed him, first of all?
A Officer Crapello actually placed the handcuffs on.
Q And while he was doing that what were you doing?
A I was controlling the suspect basically trying to prevent him so he wouldn't be able to reach or move to any other areas.
....
Q And can you tell us the condition of the clip?
A Well, condition, it just looked like any ordinary clip or magazine to a handgun. I really didn't notice any distinct condition other than it wasdid have ammunition in the clip.
Q Okay. And when you say ammunition what are you referring to?
A Bullets.
Q And what happened next after the handcuffing and you've examined the clip, what did you do next?
A At that point again Officer Crapello was patting him down and I asked the suspect a question, where the gun was for the clip.
Q And did he respond?
A He told me it was under the front seat.
Q And what did you do in response to that? *1130 A At that point, again, he was handcuffed, Officer Crapello began to take him to the car so I entered the suspect's vehicle and checked under the front seat.
Q And what, if anything, did you find there?
A I found a handgun underneath the front seat.
Defendant was placed under formal arrest and taken to Fairfield Police Headquarters. It is undisputed that the officers subsequently learned that the missing person report was withdrawn by defendant's brother nineteen days earlier, but the Jefferson Police Department's effort to remove it from the NCIC computer was unsuccessful. At headquarters, it was discovered that defendant matched the description of a man who committed a robbery of two persons at a gas station in Morris County on April 8, 1998. During the robbery, one of the victims was shot and killed. Defendant gave an incriminating tape recorded statement about the robbery and shooting to two Morris County investigators who were called to the Fairfield Police Headquarters, and a subsequent ballistics test revealed that the gun found in the car was the murder weapon.
Judge B. Theodore Bozonelis found the request that defendant exit the vehicle and "pat down" during the "missing person" investigation was lawful based on the "community care taking function," and a "logical extension of Terry [v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)]." He also rejected defendant's argument that an erroneous "NCIC missing person's report which should have been removed," was "akin" to an "invalid warrant," despite the officer's good faith at the time. The judge concluded:
[An] [a]rrest warrant is punitive in nature and exists to ensure that a defendant that is detained that is arrested where there's [a] missing person report, is protective in nature, existing to render help to those who need it.
....
I think the compelling argument is the nature of the information that is received by the officers, that is protectivetype information from the NCIC, remembering that we're talking about a stop and frisk under the community caretaking doctrine that's what caused the officers to go there. It wasn't a warrant for an arrest, it wasn't a punitive detention type situation, it was an investigation based upon protection to the individual and the public.
The judge also rejected defendant's arguments addressed to the handcuffing of defendant and subsequent inquiry, stating:
[T]he handcuffing was not improper under the circumstances especially in light of what was discovered. The discovery of the clip and the discovery of the clip in and of itself, although I'm not reaching that issue, but in and of itself may have given probable cause to believe a gun was in the car, reaching a probable cause situation and a right to search without a warrant on a motor vehicle stop exception as indicated by State v. Patino at 83 New Jersey one, pages nine through 11, [414 A.2d 1327, 1331-32] 1980 case.
The Court is finding that the handcuffing in terms of chronology of events that occurred here was reasonable, under the circumstances was minimally intrusive, was done based upon all of the suspicious circumstances that the officer had and was done while the officer could confirm or dispel his reasonable suspicion that a gun was either on defendant's person or within his immediate reach.
Which brings me to the next issue which is the public-safety exception as *1131 argued by the State with respect to failure to give Miranda warnings when asking a question of where is the gun at the time of the pat-down and finding of the clip. Public-safety exception in Miranda, is stated in New York v. Quarles at 467 U.S., 649, [104 S.Ct. 2626, 81 L.Ed.2d 550] 1984 decision as well as adopted by State In The Interest of A.S., 227 New Jersey Super., 541, [548 A.2d 202,] Appellate Division 1988 decision in New Jersey. There police officers were pursuing a suspect who they believe was carrying a gun and after catching the suspect he was frisked, no gun was found. Without Mirandizing A.S. they asked the location of the gun and the Court upheld that and found that regardless of whether A.S. was in custody at the time of the questioning, the concern for public-safety is paramount to the adherence to a literal reading of Miranda. Because you're talking there about a prophylactic rule, a procedural rule of giving Miranda warnings versus, if we had a situation where someone had been given their warnings, exercised their constitutional right to remain silent and then before being Mirandized were asked the question, where the gun was, versus the procedural prophylactic rule. The circumstances for the public-safety under the spontaneity of the situation allows that question to be asked, that was clearly the spontaneity of the situation here with respect to the short period of time approaching the vehicle, taking Mr. DiLoreto out of the vehicle, finding the clip and then the concern for the location of the weapon.
The judge alternatively concluded that defendant was "not in custody" when asked about the clip and gun, and that the gun was, in any event, admissible because of the "inevitable discovery of the weapon."

II.
We deal first with some procedural issues.
Early in the morning of April 10, 1998, at the Fairfield Police Headquarters, defendant gave a taped incriminatory statement about the robbery and shooting to Sgt. Gary Denamen of the Morris County Prosecutor's office. Defendant argues that the statement is a "fruit of the poisonous tree" of the illegal search and arrest of the night before notwithstanding the trial judge's finding "that he gave statements knowingly, intelligently, and voluntarily."[3] The State contends, "[a]s a threshold matter [that] defendant's unconditional guilty plea prevents him from now arguing that his statements" "made at the scene concerning the clip and the gun" and at headquarters are inadmissible.
In pleading guilty, defendant was told that, as part of the disposition which left the penalty phase for trial, he could appeal the pretrial rulings. The exchange was as follows:
BY THE COURT:
Q Now, Mr. DiLoreto, I just had a Bench conference with your attorneys and with the State to also go over the fact that you will recall that you were before me with respect to issues surrounding a motion that you made through your attorney to suppress evidence in this case that was seized by the police and the statements that you *1132 made in that regard. Do you recall all of that?
A Yes, sir.
Q Okay. And you understand that I made decisions in that regard. Okay? Do you understand that?
A Yes.
Q All right. And your attorneys have answered all of your questions with respect to that motion to suppress and my decision in that regard?
A Yes, sir.
Q Okay. And even though you're pleading, you're admitting to the offenses here, you also understand that those issues are still available to you with respect to rights to appeal. Do you understand that?
A Yes, sir.
The parties have not presented us with the motion to suppress, but the briefs on the motion have been presented and reflect that it was addressed to the events in the hotel parking lot and not the statement at headquarters. The latter was properly the subject of a subsequent, independent hearing. See N.J.R.E. 104(c). See also R. 3:5-7; State v. Robinson, 224 N.J.Super. 495, 540 A.2d 1313 (App.Div.1988). However, the colloquy with defendant relating to his non-negotiated guilty plea did not develop the differences or distinguish between statements.
As a result of the preservation of rights regarding "statements," in the plural and without limitation, we shall consider defendant's attack on all the evidence obtained after the "pat-down," including the statements made at police headquarters as well as the scene of the arrest. The guilty plea does not constitute a waiver of defendant's challenge to any of his statements in this setting. See State v. Brown, 352 N.J.Super. 338, 350-51 n. 7, 800 A.2d 189, 196 n. 7 (App.Div.), certif. denied, 174 N.J. 544, 810 A.2d 64 (2002); id. at 357, 360, 800 A.2d at 199-200 (Stern, P.J.A.D. concurring); State v. Stephenson, 350 N.J.Super. 517, 519, 796 A.2d 274, 276 (App.Div.2002). See also State v. Carty, 170 N.J. 632, 655-61, 790 A.2d 903, 917-20 (2002) (Stein, J. concurring), opinion modified, 174 N.J. 351, 806 A.2d 798 (2002); State v. Lashley, 353 N.J.Super. 405, 413-14, 803 A.2d 139, 144-45 (App.Div.2002) (discussing impact of illegal arrest and suppression of physical evidence on statement claimed to be "fruit of the poisonous tree").[4]
The State further argues that "any error" in finding defendant's oral statements given in the hotel parking lot admissible "was harmless" because "[e]ven without those statements ... strong circumstantial evidence tied him to the gun. Thus, there is no reasonable possibility that the result below (the decision to plead) would have been different without his statements." At argument before us, the State also suggested that the defendant's present claims need not be considered because other evidence, including a videotape of the robbery and shooting[5] and defendant's "latent fingerprints" at the scene of those crimes, was not challenged at the motion to suppress, *1133 is admissible, and provides more than enough evidence to sustain the convictions. The State seems to suggest, taking a page from Hill v. Lockhart, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), that defendant would still have pled guilty even if the evidence he now challenges is inadmissible. In Hill the defendant was denied federal habeas corpus in the absence of an allegation that he would not have pled guilty but for counsel's incompetence and lack of advice.
However, the issue before us involves neither an application to withdraw a guilty plea nor a petition for post-conviction relief based on ineffective assistance of counsel. It is an appeal under R. 3:5-7(d) that is premised on the right of a defendant to withdraw his plea if the motion to suppress was wrongly decided in whole or in part. In other words, defendant's guilty plea was conditioned on his right to appeal the denial of his pre-plea motion, R. 3:5-7(d) (and in this case his pre-plea attack on the statements as well). If he or she succeeds on the appeal, and there is other evidence to warrant prosecution, a defendant may choose not to withdraw a guilty plea if a favorable sentence recommendation was made as part of a negotiated disposition, or because charges dismissed incident to the negotiated plea would be resurrected upon withdrawal. However, our plea preservation rules give the defendant the right to withdraw a guilty plea when the right to appeal survives the plea and defendant succeeds on appeal.[6]See R. 3:5-7(d); R. 3:9-3(f).
In this case, defendant would have little incentive for not withdrawing the plea. There was no negotiated disposition, and the jury reported that it could not "unanimously agree upon punishment" at the penalty phase. In New Jersey, a hung jury at the penalty phase of a capital prosecution is a disposition and defendant cannot be subject to a second capital prosecution. N.J.S.A. 2C:11-3c(3)(c); see also State v. Biegenwald, 110 N.J. 521, 542, 542 A.2d 442, 452 (1988); State v. Ramseur, 106 N.J. 123, 309-13, 524 A.2d 188, 283-85 (1987), denial of habeas corpus aff'd sub nom., Ramseur v. Beyer, 983 F.2d 1215 (3d Cir.1992), cert. denied, Ramseur v. Beyer, 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993). Hence, in weighing his decision to withdraw his plea and stand trial, this defendant cannot be encumbered by the fear of being subject to a prosecution seeking the death penalty again. Accordingly, we must examine all issues raised on the appeal.

III.
A finding that the officers acted in good faith is implicit in the trial judge's finding. We accept that finding, see State v. Locurto, 157 N.J. 463, 471-74, 724 A.2d 234, 238-41 (1999), and it is critical to our determination. We agree with Judge Bozonelis that in these circumstances the officers, while acting in good faith, could direct defendant, the subject of an "endangered missing person" report, to exit his vehicle and to place him in a police car while they obtained the details regarding the "missing person" report. We also agree that in these circumstances the defendant could be subjected to a "pat down" prior to being placed in the police car, and that the fact that the "missing person" report should have been withdrawn from the NCIC system *1134 does not affect the objective reasonableness of the officers who relied in good faith on the report.
We recognize that the issues before us pose difficult questions and that their resolution is debatable, particularly in a State in which we have afforded greater protection to criminal defendants under the State Constitution, N.J. Const. art. I, § 7, than the Fourth Amendment to the Federal Constitution, see, e.g., Joye v. Hunterdon Central Regional High School Bd. of Ed., 176 N.J. 568, 615, 826 A.2d 624, 653 (2003); id. at 636, 826 A.2d at 665 (LaVecchia, J. dissenting); State v. Carty, 170 N.J. 632, 790 A.2d 903 (2002); State v. Cooke, 163 N.J. 657, 664-71, 751 A.2d 92, 95-99 (2000); State v. Novembrino, 105 N.J. 95, 157-59, 519 A.2d 820 (1987). But it is not for us to select the preferable practice of conducting a "missing person" investigation or to conclude what the police should have done once the "missing person" "hit" was received. The issue is only whether the police officers acted reasonably in the circumstances they faced, and we cannot conclude that the officers were unreasonable in asking a suspected "endangered missing person" to exit his vehicle and wait in the patrol car while they ascertained the basis for the report. Nor were the police unreasonable in patting down the reportedly "endangered missing person" before they put him in their vehicle until they learned why he was reported missing and the facts relating to the report which could inform them if he might be a danger to himself or others. We acknowledge that the cases on which we rely are distinguishable and that some can be read to support a contrary conclusion. However, the bottom line to us is that the police acted reasonably because they were entitled to consider that a missing person report reflects a concern that something extraordinary has occurred in the subject's life, and the police were warranted in taking the action they did.

A.
Defendant argues that the facts did not give rise to reasonable and articulable suspicion of wrongdoing justifying the officers to conduct a pat-down of defendant, or to put him into the police car, pending investigation of the missing person report. We recognize, of course, that an "investigatory detention" (or a "Terry stop") must be based on "`specific and articulable facts which, taken together with rational inferences from those facts' give rise to a reasonable suspicion of criminal activity." State v. Rodriguez, 172 N.J. 117, 126, 796 A.2d 857, 862 (2002) (quoting Terry v. Ohio, supra, 392 U.S. at 21, 88 S.Ct. at 1868, 20 L. Ed.2d at 906). We also recognize that "[u]nder Terry, supra, an officer is permitted to pat down a citizen's outer clothing when the officer `has reason to believe that he is dealing with an armed and dangerous individual,'" State v. Nishina, 175 N.J. 502, 514, 816 A.2d 153, 160 (2003) (quoting Terry, supra, 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909). Thus, a "pat-down" is generally permitted only when an officer has "an objectively reasonable suspicion that a suspect is armed and dangerous," Nishina, supra, 175 N.J. at 515, 816 A.2d at 161 (quoting State v. Thomas, 110 N.J. 673, 679, 542 A.2d 912, 915 (1988)) ("a Terry protective search"), or "when an officer has probable cause to believe that a crime has been or is about to be committed and the officer is faced with exigent circumstances." Nishina, supra, 175 N.J. at 515, 816 A.2d at 160 (citing State v. DeLuca, 168 N.J. 626, 632-33, 775 A.2d 1284, 1287 (2001)). See also Nishina, supra, 175 N.J. at 517, 816 A.2d at 162-63.
We find no authority requiring strict application of the Terry line of cases to the investigation of a missing person report where the police do not know the basis for the report including whether the individual *1135 is dangerous to himself or others. We have found only one analogous case. In State v. Boyd, 654 N.W.2d 392 (N.D.2002), a sheriff's officer ran a vehicle "license plate check" on a vehicle with out-of-state license plates. The report noted an NCIC request to perform a welfare check on theowner of the vehicle as a "`possibly missing and/or endangered' female." Id. at 394. When locating the vehicle again, the officer noticed two men in the front seat and a woman in the back seat. State v. Boyd, supra, 654 N.W.2d at 394. The officer "`pulled in behind'" the car and ordered all the occupants out of the car. Ibid. A "pat down search" found drugs on one of the occupants. The vehicle was "impounded" after a "drug dog showed" a positive "hit" for drugs, and "Boyd later consented to a vehicle search" of her car in which drugs were found. Ibid. The denial of her motion to suppress was affirmed.
The Supreme Court of North Dakota concluded that the circumstances "illustrate [d] the inapplicability of the community caretaker exception." Id. at 396. The court stated that by immediately "issuing orders and demanding compliance [the officer] removed himself from the scope of acceptable actions for officers acting as community caretakers." Ibid. Nevertheless, the court found that the officer's "actions were supported by reasonable and articulable suspicion of criminal activity." Id. at 397. After noting that Terry stops were a different "type[ ] of law enforcement-citizen encounter[ ]" than "community caretaker encounters, which do not constitute Fourth Amendment seizures," id. at 395, the majority found that the officer's actions were supported by "reasonable and articulable suspicion that a crime has been or was about to be committed based on the NCIC report that the owner of the vehicle was a `possibly missing and or endangered' female." Id. at 398.[7] A concurring opinion found that the criteria applicable for entering a "missing person" report onto the NCIC system warranted a finding of "particularized suspicion." Id. at 400. The concurring justice concluded "that under an objective standard [the officer] acted reasonably in detaining the occupants of the car to ascertain whether there was a `missing and/or endangered female' [and that] [s]ubsequent events justified the further searches conducted by the officers." Ibid. See also Matter of Bernard G., 247 A.D.2d 91, 679 N.Y.S.2d 104 (1998) (pat down but not full search not permissible under New York juvenile run-away statute).
The report of "a missing person associated [with a motor] vehicle," justifies a stop. State v. Soukharith, 253 Neb. 310, 570 N.W.2d 344, 354 (1997); see also Woodbury v. State, 730 So.2d 354, 355 (Fla.Dist.Ct.App.), review denied, 743 So.2d 17 (Fla.1999) (stop of vehicle belonging to person reported as missing proper; "canine search" after "`dog alert'" "within a reasonable time after the vehicle was stopped" was "justified"); People v. Rowe, 172 A.D.2d 701, 568 N.Y.S.2d 648 (1991) (stop of vehicle of person reported missing; defendant properly taken into custody when he attempted to flee). The need to investigate a missing person's report does not flow from the concern about criminal wrongdoing or involve the search for evidence of a crime, and the police conduct must be evaluated in that context. People v. Bondi, 130 Ill.App.3d 536, 85 Ill.Dec. 773, 474 N.E.2d 733, 735-36 (1984), cert. denied sub nom. Bondi v. Illinois, 474 *1136 U.S. 836, 106 S.Ct. 111, 88 L.Ed.2d 91 (1985) (warrantless entry into home of defendant whose wife was reported missing did not require suppression of evidence; the warrantless entry was "not to seize evidence"). Hence, the need to locate the missing person and provide any necessary assistance justify the investigative stop and detention. Ibid.;[8] see also People v. Coddington, 23 Cal.4th 529, 97 Cal. Rptr.2d 528, 2 P.3d 1081, 1125 (2000), cert. denied sub nom. Coddington v. California, 531 U.S. 1195, 121 S.Ct. 1199, 149 L.Ed.2d 113 (2001), overruled on other grounds, Price v. Superior Court, 25 Cal.4th 1046, 108 Cal.Rptr.2d 409, 25 P.3d 618 (2001) (warrantless entry into defendant's mobile home upheld in capital prosecution where there was a reasonable belief that kidnap victims were inside; "[a] reasonable belief of an imminent threat to life or welfare of a person within the home, probable cause to believe that a person reliably reported missing is within, or a reasonable belief that a person within is in need of aid, are well recognized as exigent circumstances that justify a warrantless entry"). If the police can enter a home without a warrant to search for a missing person where there is a perceived danger, the less intrusive conduct at issue before us should be sustained, especially given the fact-finding which suggests no lack of good faith.
We have recognized that the community caretaking function is designed to assist citizens in need and is "divorced from the detection, investigation or acquisition of evidence relating to the violation of a criminal statute." State v. Costa, 327 N.J.Super. 22, 28, 742 A.2d 599, 602 (App.Div. 1999) (citing Cady v. Dombrowski, 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706, 715 (1973)); see also State v. Frankel, 341 N.J.Super. 594, 775 A.2d 665 (App.Div.2001); State v. Drummond, 305 N.J.Super. 84, 88, 701 A.2d 958, 960 (App. Div.1997); State v. Washington, 296 N.J.Super. 569, 572, 687 A.2d 343, 344 (App.Div.1997).
In State v. Costa, defendant and a friend were sitting in defendant's parked car outside an open tavern late at night. State v. Costa, supra, 327 N.J.Super. at 26, 742 A.2d at 601. After they exited the car, an officer stopped them and inquired why they had been waiting in the car. Ibid. Defendant explained that they were waiting for a song on the radio to finish before entering the tavern. Costa, supra, 327 N.J.Super. at 26, 742 A.2d at 601. The officer then asked to see defendant's credentials. Ibid. After they were produced, the officer asked both men to empty their pockets and then performed a "patdown search" which "revealed nothing." Costa, supra, 327 N.J.Super. at 26-27, 742 A.2d at 601-02. Thereafter, the officer placed them in his vehicle while performing a computer check on them and the vehicle. Id. at 27, 742 A.2d at 602. That check "revealed that nothing was amiss." Ibid. We found that, while the initial inquiries of the defendant and his friend were authorized, the subsequent detentions were unlawful because "[t]he officer clearly intended the stop to be an investigation into criminal conduct," and it was unsupported by an articulable suspicion. Costa, supra, 327 N.J.Super. at 28, 742 A.2d at 603. The officer was found to have "overreach[ed] his lawful authority provided by his community caretaking function" because the incident did not involve "a benign stop that escalated into a criminal investigation." Ibid. In reversing the denial of a motion to suppress, we stated:

*1137 [D]efendant and Priate exited a vehicle in a lit parking lot on the premises of an open business establishment. They answered the officer's inquiry, and defendant presented his driver's license, his automobile registration, and his insurance identification card. Additionally, the officer had not observed a traffic violation or even abnormal driving and did not have any report that defendant or Priate might be in need of police assistance.
Even assuming the officer's inquiry was proper, the subsequent questions and search converted the field inquiry into a Terry stop unsupported by a reasonable articulable suspicion. In Terry v. Ohio, the United States Supreme Court mandated that any search of a person for the purposes of investigation or the police officer's safety must be predicated on "articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."
[Id. at 30, 742 A.2d at 604 (citations omitted).]
Costa involves a circumstance in which an officer was concerned with suspicious conduct of individuals in a car, not with a person reported as missing who might be in need of help or who might pose a danger to himself or others. See also State v. Frankel, supra, 341 N.J.Super. at 601-02, 775 A.2d at 669-70 (warrantless entry of home in response to "911" call sustained; no need to suppress evidence observed in plain view); State v. Garbin, 325 N.J.Super. 521, 526, 739 A.2d 1016, 1019 (App. Div.1999), certif. denied, 164 N.J. 560, 753 A.2d 1153 (2000) ("[a] police officer's observation of a person operating a motor vehicle in a manner that indicates something may be wrong with the vehicle or its driver is one recognized circumstance in which the police may take appropriate action in the performance of the community caretaking responsibilities"; entry into defendant's garage to investigate upheld);
State v. Scott, 118 N.J. 406, 571 A.2d 1304 (1990) (rev'g on concurring and dissenting opinion, 231 N.J.Super. 258, 269-77, 555 A.2d 667, 672-76 (App.Div.1989)) (entry into home and arrest of defendant based on report of domestic violence upheld); State v. Drummond, 305 N.J.Super. 84, 89-90, 701 A.2d 958, 960-61 (App.Div.1997) (suggesting that Terry principles noted in State v. Davis, 104 N.J. 490, 517 A.2d 859 (1986), can become applicable based on conduct of defendant in response to "community caretaking").
In evaluating the propriety of a patdown of a missing person, we are guided, in part, by the Court's recent evaluation of the constitutionality of random drug testing of high school students. In Joye v. Hunterdon Central Regional High School Board of Education, supra, 176 N.J. at 573, 826 A.2d at 626 Justice Verniero discussed prior New Jersey precedent and the concept of administrative searches, and said:
The fruits of the search in [State in Interest of T.L.O., 94 N.J. 331, 463 A.2d 934 (1983), rev'd, New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985)], resulted in the police filing delinquency charges against the student. Notwithstanding that the case implicated the student's liberty interests, we nonetheless relaxed the warrant and probable cause requirements because of the unique public-school context. We likewise have condoned other forms of administrative searches, free of traditional constitutional requirements, especially when unconnected with law enforcement. For example, we observed recently that we would expect doctors or nurses at a State-run psychiatric hospital routinely to search all areas of the hospital, including a patient's private room. [State v. Stott, 171 N.J. 343, 363, 794 A.2d 120, 132 (2002)]. Such searches are necessary "to ensure that patients *1138 are not in a position to harm either themselves or others." Ibid.
Similarly, we dispensed with the requirements of probable cause and individual suspicion in permitting random drug testing of transit police officers in N.J. Transit [PBA Local 304 v. New Jersey Transit Corp.], supra, 151 N.J. [531] at 564-65, 701 A.2d 1243 [1259-60]. In that case, New Jersey Transit Corporation, a public agency, adopted a random drug and alcohol testing policy consistent with federal transportation regulations. Id. at 537-38, 701 A.2d at 1246. The agency sought to test, without individualized suspicion, transit policy officers who carried firearms for security purposes and who performed safety-sensitive functions. Id. at 538, 701 A.2d at 1246. The officers objected, claiming that the policy violated their right to be free of unreasonable searches and seizures under the New Jersey Constitution. Id. at 541, 701 A.2d at 1248.
The tests involved the collection of urine samples in accordance with certain confidentiality and privacy protocols. In evaluating the officers' objections, we reviewed the pertinent federal decisions that have held that "a suspicionless search may be permissible when the search serves special needs, beyond the normal need for law enforcement." Id. at 548, 701 A.2d at 1251 (internal quotation marks and citation omitted). We were satisfied "that the special needs test [under federal law] provides a useful analytical framework for considering the protections afforded by ... the New Jersey Constitution[.]" Id. at 556, 701 A.2d at 1255. That framework, we explained "enables a court to take into account the complex factors relevant in each case and to balance those factors in such a manner as to ensure that the right against unreasonable searches and seizures is adequately protected." Ibid.

[Joye, supra, 176 N.J. at 593-94, 826 A.2d at 640 (emphasis added).][9]
Similarly, here, we are concerned with the officers' attempt "to promote public safety and not to serve law enforcement needs" in terms of searching for evidence of crime or wrongdoing. Traditional notions of search and seizure law and use of the exclusionary rule do not apply in this setting. Joye, supra. See also, e.g., State v. Carty, supra, 170 N.J. at 656-57, 790 A.2d at 917-18; State v. Bisaccia, 58 N.J. 586, 591-92, 279 A.2d 675, 677-78 (1971); Tartaglia v. Paine Webber, Inc., 350 N.J.Super. 142, 148-49, 794 A.2d 816, 819-20 (App.Div.2002), setting forth the purposes of the exclusionary rule. The fact that evidence of a crime was discovered is not dispositive. Rather, we must evaluate, from an objective point of view, whether the officers acted reasonably at the time of their challenged conduct and reasonably believed their conduct was "`totally divorced from the detection, investigation or acquisition of evidence relating to the violation of a criminal statute.'" State v. Stott, 171 N.J. 343, 361, 794 A.2d 120, 130-31 (2002) (expectation of privacy in room of psychiatric hospital; search of psychiatric patient's room not subject to "community caretaking" exception); see also State v. Bruzzese, 94 N.J. 210, 220, 463 A.2d 320 (1983) (employing objective standard), cert. denied, 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984). As noted in Joye, case law "instructs us to consider society's viewpoint when evaluating whether an expectation of privacy is entitled to enhanced *1139 protection in a given circumstance." Joye, supra, 176 N.J. at 613, 826 A.2d at 651.
In essence, we conclude that, because the police did not suspect criminal wrongdoing and were not investigating criminal activity, the officers could ask defendant to step out of the car and, incident to their good faith performance of their "community caretaking" function, conduct a "pat down" incident to placing him in the police car for the limited period necessary to inquire about the "missing person" report. We are not dealing with a minor motor vehicle or traffic violation which precluded the placement of defendant in the police vehicle and the "pat down" incident thereto. See State v. Lozada, 92 Ohio St.3d 74, 748 N.E.2d 520, 525-526 (2001) (holding "that, during a routine traffic stop, it is reasonable for an officer to search the driver for weapons before placing the driver in a patrol car, if placing the driver in the patrol car during the investigation prevents officers or the driver from being subjected to a dangerous condition and placing the driver in the patrol car is the least intrusive means to avoid the dangerous condition"); Wilson v. State, 745 N.E.2d 789, 792-793 (Ind.2001) (in circumstances where individual can be placed in patrol car, "it is generally reasonable for a prudent officer to pat down persons placed in his patrol car, even absent a belief of dangerousness particularized to the specific detainee," but "declin[ing] to hold that the Fourth Amendment permits the police routinely to place traffic stop detainees if this necessarily subjects the detainee to a preliminary pat-down frisk"); State v. Varnado, 582 N.W.2d 886, 891 (Minn.1998) ("when officer has a valid reasonable basis for placing a lawfully stopped citizen in a squad car, a frisk will often be appropriate without additional individual articulable suspicion," but "the inability of a minor traffic violator to produce a driver's license in and of itself is not a reasonable basis to require the driver to sit in the back of a squad car"); State v. Evans, 67 Ohio St.3d 405, 618 N.E.2d 162, 167 (1993), cert. denied, sub nom. Evans v. Ohio, 510 U.S. 1166, 114 S.Ct. 1195, 127 L.Ed.2d 544 (1994) (police may order driver out of vehicle after traffic stop; inability to produce driver's license justified placing defendant in police car and conducting a pat down incident thereto; "[w]hen balanced against the driver's minimal privacy interests under these circumstances, we can only conclude that the driver of a motor vehicle may be subjected to a brief pat down search for weapons where the detaining officer has a lawful reason to detain said driver in the patrol car"); Moore v. Commonwealth, 25 Va.App. 277, 487 S.E.2d 864 (1997) (pat down of driver and passengers valid after motor vehicle stop when occupants placed in police cruiser before inventory).[10]
In the totality of the circumstances, including the fact that defendant turned off his ignition and appeared to be asleep in the short period during which Crapello initially passed by, checked his MDT, and returned to the scene and during which it was raining "moderate[ly], although not too hard," the police acted reasonably in asking defendant to exit his vehicle and wait in the police car, and to "pat him down" incident thereto, while awaiting the details of the missing person report. See Wilson v. State, supra, 745 N.E.2d at 793, noting "[i]nclement weather" and "lack of available lighting for paperwork" as "circumstances" justifying placement of "a *1140 stopped motorist" in a police car. We respectfully reject the contrary conclusion of our dissenting colleague who relies on concepts relating to police officers while performing law enforcement functions, as opposed to performing an act designed to protect a member of the public reported to be an "endangered missing person." As the Supreme Court of Ohio has said in upholding a pat down after ordering a driver out of his car and deciding to place him in the police vehicle, "[t]he state's obligation not to violate the individual's Fourth Amendment rights does not command that the police officer forsake reasonable precautionary measures during the performance of his duties." State v. Evans, supra, 618 N.E.2d at 167.

B.
The fact Officer Filipow entered defendant's pocket upon feeling "a large metal object" or "a very large metal type object" does not require suppression of the ammunition clip or gun.[11] The officer did not have to know what the object was as long as "he was not assured it was not a weapon" and, by an objective standard, "a reasonable officer in his circumstances could justifiably have believed that the item was a weapon." United States v. Swann, 149 F.3d 271, 275-76 (4th Cir.1998) (officer had right to remove "hard object in [defendant's] sock"); State v. Evans, supra, 618 N.E.2d at 171-72 (officer can remove article if he "reasonably believes" it "could be a weapon"; here the search was lawful because the "officer could not discount the possibility that it was a weapon"). See also State v. Roach, 172 N.J. 19, 26-29, 796 A.2d 214, 218-20 (2002).
Once the ammunition clip was found, the subsequent police conduct was warranted. See State v. Wilson, 362 N.J.Super. 319, 331, 827 A.2d 1143, 1150 (App.Div.2003), in which we held that, while, in New Jersey, exigent circumstances as well as probable cause are necessary to search a vehicle, State v. Cooke, 163 N.J. 657, 670-71, 751 A.2d 92, 99 (2000), knowledge that a gun is missing provides exigent circumstances to search a vehicle despite the arrest of the occupant. As in Wilson, here, the warrantless entry of the vehicle was justified to search for the gun in the automobile, based on the finding of the loaded ammunition clip because the gun could provide a danger even before a warrant could be secured. As Judge Collester wrote in Wilson, supra, 362 N.J.Super. at 333, 827 A.2d at 1152, there was a "real danger ... that an automatic handgun could fall into malevolent, untrained or immature hands."
Nor is suppression of the gun required because the police asked defendant where the gun was located. Particularly in these circumstances in which defendant had not been arrested for a crime, the limited inquiry could be made in the interests of public safety. State v. Stephenson, supra, 350 N.J.Super. at 525, 796 A.2d at 279 (citing New York v. Quarles, 467 U.S. 649, 659, n. 8, 104 S.Ct. 2626, 2633, n. 8, 81 L.Ed.2d 550, 559, n. 8 (1984)); see also State v. Hickman, 335 N.J.Super. 623, 631, 763 A.2d 330, 335 (App.Div.2000) (stating that "[r]oadside questioning of a motorist [about the existence of contraband or a weapon] is not transformed into `custodial interrogation' that must be preceded by Miranda warnings simply because a police officer's questioning is accusatory in nature or designed to elicit incriminating evidence"); State in Interest of A.S., 227 N.J.Super. 541, 547-48, 548 A.2d 202, 206 (App.Div.1988) (Coleman, P.J.A.D.) (applying both principles).
*1141 Finally, the fact that the missing person report should have been withdrawn from the NCIC computer and that the Jefferson police unsuccessfully endeavored to do so, does not affect the result. See State v. Boyd, supra, 654 N.W. 2d at 398 (police officer may rely on NCIC report). Of course, as defendant argues, New Jersey does not recognize the good faith exception to the warrant requirement, State v. Novembrino, supra, but we are dealing here with circumstances in which no warrant was needed and in which the conduct of Officers Crapello and Filipow was reasonable because they were acting in good faith reliance on an existing missing person report, and neither was endeavoring to search nor arrest the person who they asked to exit the car. State v. Novembrino, supra, 105 N.J. at 157-59, 519 A.2d at 856-57, held that a search warrant could not be sustained when the warrant was defective, notwithstanding that its execution was in good faith. See also State v. Moore, 260 N.J.Super. 12, 15, 614 A.2d 1360, 1361-62 (App.Div.1992) (suppressing evidence obtained in search incident to an arrest premised on a warrant which had been previously "vacated"). Here, as in State v. Moore, we are concerned with the failure of law enforcement officers to update computer records. However, in this case, we do not deal with the "good faith" exception to the warrant requirement, and we do not deal with the need for a determination based on probable cause or for a warrant to perfect an arrest. Cf. State v. Chaney, 318 N.J.Super. 217, 226-27, 723 A.2d 132, 136-37 (App.Div.1999), in which the police entered a motel room in good faith reliance on the existence of an arrest warrant for someone with the same name as defendant, and State v. Green, 318 N.J.Super. 346, 353, 723 A.2d 1012, 1015-16 (App.Div.1999), in which the wrong person was arrested on a valid warrant and searched incident thereto. In both cases, speaking through Judge Skillman, we upheld the police conduct as "reasonable." See also State v. Scott, supra. Here, the police in Fairfield acted "reasonably" in good faith reliance on information obtained through the NCIC.[12]

IV.
The parties agree that the imposition of NERA on the sentence for murder must be vacated given the date of the offense. State v. Manzie, 335 N.J.Super. 267, 762 A.2d 276 (App.Div.2000), aff'd, 168 N.J. 113, 773 A.2d 659 (2001). While the form of the judgment is in error, because the armed robbery embodied in count three was made concurrent to two separate consecutive sentences (counts one and two), the judge made the armed robbery of the murder victim embodied in count two consecutive to the murder. The judge noted that he was imposing a consecutive sentence for the armed robbery of the murder victim because the defendant started to leave the scene of the robbery and then returned to commit a purposeful or knowing murder.
The robbery victim named in count three was separate from the murder victim. It may have been preferable if that count was expressly made to run consecutive to count one, but the judge did that in the sense that he made it concurrent to the other armed robbery, which was consecutive to the murder. We find no basis for disturbing the sentence.

*1142 V.
The matter is remanded for resentencing on count one by amendment of the ineligibility term to thirty years. See N.J.S.A. 2C:11-3b(1). See State v. Manzie, supra. The judgment is otherwise affirmed.
COBURN, J.A.D., concurring in part; dissenting in part.
The police violated the Fourth Amendment to the United States Constitution at least twice: when they unreasonably seized defendant by ordering him out of his parked car and when they thereafter searched defendant's outer clothing for weapons without having reasonable fear for their own safety or the safety of others in the area. Therefore, the magazine, the gun, the admissions, and the confession should have been suppressed as fruits of the illegal seizure and subsequent search. State v. Smith, 155 N.J. 83, 100, 713 A.2d 1033, 1042, cert. denied, 525 U.S. 1033, 119 S.Ct. 576, 142 L.Ed.2d 480 (1998) (citations omitted). Since I agree with the majority's conclusion that defendant preserved these constitutional issues when he entered his guilty plea, I would reverse the order denying suppression and the judgment of conviction, and remand for a trial limited to untainted evidence.
The majority opinion creates an incoherent reading of the Fourth Amendment. Following its logic, a missing adult stopped by the police would have less protection under the Fourth Amendment than someone who appeared to be a criminal, and the police would have more protection against the missing person than they would have in a confrontation with an apparent criminal.
The majority acknowledges that the police did not have an articulable basis for thinking that a crime was afoot, at least after they learned that defendant was the missing person and he appeared to be entirely safe. Since they received that information before they ordered defendant out of his car, the further detention inherent in that action was unwarranted under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). When it appeared that no crime was in progress and that defendant had no need of police assistance, the confrontation should have reverted to a field inquiry, which only permits questioning of "a citizen in a conversational manner that is not harassing, overbearing, or accusatory in nature." State v. Nishina, 175 N.J. 502, 510, 816 A.2d 153, 158 (2003)(internal citation and quotation marks omitted).
The only possibly applicable exception to the warrant requirement other than Terry is the community caretaking doctrine, which I believe the majority misapplies. Community caretaking justifies police intervention that is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." State v. Stott, 171 N.J. 343, 361, 794 A.2d 120, 131 (2002) (internal quotations and citation omitted). However, the police conduct must be reasonably related to the caretaking function. See State v. Costa, 327 N.J.Super. 22, 28-31, 742 A.2d 599, 602-04 (App.Div.1999). As soon as it appeared that defendant was safe and did not want police assistance, which was evident before the order to exit his car, no further police action was warranted, and the police order was a seizure that violated defendant's Fourth Amendment rights.
Even if additional circumstances were present that would have made the order to exit the car reasonable, the ensuing frisk, which is a separate inquiry from the stop, remains unjustifiable. As we observed in State v. Garland, 270 N.J.Super. 31, 43, 636 A.2d 541, 547-48 (App.Div.), certif. denied, 136 N.J. 296, 642 A.2d 1005 (1994), *1143 "[a]n officer cannot simply assume that everyone is armed and dangerous until proven otherwise." Were that the case, "officers would be able to frisk at willa result not contemplated by the Fourth Amendment...." Id. at 44, 636 A.2d at 548 (citation omitted). Although we made that statement in the context of a Terry stop, there is no sound reason for treating it as irrelevant here. A possible criminal poses a greater threat than does a voluntarily missing adult. In short, no stop can be accompanied by a frisk for weapons unless the officer has an objective basis, considering all the circumstances, for believing that the person is armed and dangerous. State v. Valentine, 134 N.J. 536, 542, 636 A.2d 505, 507-08 (1994); State v. Thomas, 110 N.J. 673, 678-79, 683, 542 A.2d 912 (1988). Thus, even if we assume that the police were entitled to have defendant exit the car, in the circumstances of this case there was no basis for the frisk because no grounds existed for believing defendant was armed and dangerous. In fact, neither officer testified that he believed defendant posed a danger or that there was any suspicion of defendant being armed as a reason for engaging in the frisk.
The majority tries to avoid the necessity for evidence indicating that defendant posed a danger by asserting that the decision to place defendant in the police car justified the frisk. But the officers' only reason for placing defendant in their car was their own convenience. They had not yet formed an intent to drive defendant anywhere. Nonetheless, they decided that a frisk was an appropriate precaution, and the majority opinion accepts that proposition.
The general view is that the mere convenience of placing someone in a police car will not justify a frisk. See, e.g., State v. Lozada, 92 Ohio St.3d 74, 748 N.E.2d 520 (2001); Wilson v. State, 745 N.E.2d 789 (Ind.2001); State v. Evans, 67 Ohio St.3d 405, 618 N.E.2d 162 (1993), cert. denied, 510 U.S. 1166, 114 S.Ct. 1195, 127 L.Ed.2d 544 (1994); and Moore v. Commonwealth, 25 Va.App. 277, 487 S.E.2d 864 (1997). Since I agree with those cases, I cannot accept the majority's conclusion that the decision to place defendant in the police car justified the frisk in this case. Of course, we need not decide today whether a frisk would have been reasonable if the officers had decided to drive defendant somewhere and had good reason to do so, or indeed, had any reason to place him in their car other than for their mere personal convenience.
NOTES
[1] We have had the benefit of excellent briefs from both parties and supplementary letters with new citations pursuant to R. 2:6-11(d). As stated in defendant's post-argument letter of March 13, 2003, defendant argues that "the actions of the police here, beginning at the very least with the pat-down of defendant, were illegal."
[2] Detective Debra Van Fleet of the Morris County Prosecutor's Office testified that "[e]ndangered is the catch-all phrase that the local police departments and State Police use regarding adult missing persons ... if they don't fit any other criteria, meaning disability, a catastrophic victim, or a kidnapping...." Detective Michael Rice of the Morris County Prosecutor's Office testified that defendant's brother reported him missing on March 19, 1998. He was reported to the NCIC as "a missing person with involuntary status," but on March 20, 1998, his "status was changed from involuntary status" after review by the Morris County Prosecutor's Office. On March 21, 1998, the Jefferson Township Police Department learned that defendant returned home and "attempted to cancel" the alert, but the attempts were "rejected" by the computer because a middle initial, as opposed to the middle name originally entered, was used. The name, therefore, remained in the NCIC system during the period of the "validation process." The reasons for the disappearance and concern of defendant's brother were developed at the penalty phase, but it is undisputed that the Fairfield officers knew only that defendant was reported as an "endangered missing person."
[3] In the trial court, the defendant claimed that the formal statement at police headquarters was involuntary and given in violation of his constitutional rights. Judge Bozonelis found that defendant waived his Miranda rights and "that he gave statements knowingly, intelligently, and voluntarily." Before us, defendant does not attack that finding or address the issue other than to contest admissibility as a "fruit of the poisonous tree" following the events in the hotel parking lot.
[4] If defendant were to succeed on any ground on this appeal and were to decide to withdraw his guilty plea, the plea could not, in any event, present a bar to a challenge on any future appeal to the statements because there would be no waiver in the absence of another guilty plea. That is an additional reason to consider the challenge to the statement given at police headquarters as well as the scene of the arrest.
[5] The judge reviewed the videos from the two surveillance cameras at the scene in accepting a factual basis for the guilty plea in the capital prosecution. See R. 3:9-2. They were also apparently played to the jury during the penalty phase and "during the prosecutor's summation."
[6] If the defendant simultaneously pleads to multiple indictments and the pre-plea motion relates to only one, the same principle generally applies. If, however, the defendant pleads guilty after a plea in which an issue is preserved, the subsequent plea is not subject to withdrawal upon reversal of the first conviction unless it is expressly so provided as part of the plea. See R. 3:9-3(f). These issues should be addressed at the time of plea. See State v. Brown, supra, 352 N.J.Super. at 357, 800 A.2d at 200 (concurring opinion).
[7] We recognize the fact that the presence of two other occupants could affect the suspicion because the "endangered missing person" could be a victim of their wrongdoing. A concurring opinion found that the criteria applicable for entering a "missing person" report justified the search.
[8] As to the ability to order the driver and passengers out of a car, and to conduct a "pat down," incident to a motor vehicle violation, see State v. Smith, 134 N.J. 599, 637 A.2d 158 (1994).
[9] We recognize that the random, suspicionless drug testing of students, which may be deemed more invasive than a "pat down," cannot result in a criminal prosecution if substance abuse is found. Joye, 176 N.J. at 631, 826 A.2d at 662.
[10] Our reading of the cases, also cited by the dissent, supports the ability to conduct a "pat down" incident to placing an individual in a police car. Moreover, the cases do not suggest defendant could not be placed in the police car pending the investigation of the missing person report.
[11] We apply Terry standards once the officer had the right to conduct a "pat down" even though the "pat-down" was not pursuant to a "Terry stop."
[12] To the extent that the conduct of police may be deemed relevant in not removing the defendant's name from the NCIC, any fault must be attributable exclusively to the Jefferson Township police which, in fact, endeavored to do so in a timely fashion. Compare State v. Moore, supra.