COURT OF APPEALS OF VIRGINIA

Present:  Judges Humphreys, Malveaux and Fulton
Argued at Fredericksburg, Virginia


ERIC LAMONT GREEN

v.      Record No. 0861-22-4

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE JUNIUS P. FULTON, III
SEPTEMBER 5, 2023


FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
Daniel S. Fiore, II, Judge[1]

Peter M. Baskin (Peter M. Baskin, PC, on brief), for appellant.

Timothy J. Huffstutter, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


On February 17, 2022, following a bench trial, the Circuit Court of Arlington County

convicted Eric Green of one count of eluding in violation of Code § 46.2-817(B) and one count of

reckless driving in violation of Code § 46.2-862 for events occurring on January 23, 2021, and one

count of being a violent felon in possession of a firearm in violation of Code § 18.2-308.2 for events

occurring on January 30, 2021.  Green now appeals, assigning error to the trial court's denial of his

motions to suppress the evidence stemming from his January 30, 2021 encounter with law

enforcement.  Green further challenges the sufficiency of the evidence to convict him of eluding and

reckless driving.  Because the law-enforcement officers possessed reasonable articulable suspicion

sufficient to detain Green on January 30, and the level of force applied was not more than necessary

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Judge Fiore presided over the trial, denied the second motion to suppress, and signed
the final orders in this case.  Judge Judith L. Wheat presided over the hearings regarding, and
ruled on, the first motion to suppress.

to detain Green and investigate the situation, and because the evidence presented at trial supported the convictions, we affirm the rulings of the trial court.

BACKGROUND[2]

In the early morning hours of January 23, 2021, Arlington County Police Detective Seibert was sitting in a marked police cruiser observing northbound traffic on Interstate 395. Using his "assigned measure unit" laser devise (LIDAR)[3] to measure the speed of passing traffic, Detective Seibert observed a silver Infiniti sedan (the "subject vehicle") driving approximately 124 miles per hour, greatly exceeding the 55 mile-per-hour speed limit. As the subject vehicle passed him, Detective Seibert turned on his emergency lights and followed, attempting to initiate a traffic stop. After traveling "a brief distance" on Interstate 395, the subject vehicle "abruptly took the exit for Glebe Road." Detective Seibert lost sight of the subject vehicle but drove through a nearby neighborhood "just basically looking for any Infiniti[es] that may be back there." He ultimately saw the subject vehicle again "parked on the right side of the roadway[.] . . . [He] could tell there was a little bit of steam coming from the exhaust, so [he] knew that the vehicle was on." Upon sighting the subject vehicle again, "[Detective Seibert] activated [his] emergency equipment." The subject vehicle then "took off at a high rate of speed, basically just did a U-turn," and ran through a solid

---

[2] When reviewing both the denial of a motion to suppress and the sufficiency of the evidence to convict, "we 'consider the facts in the light most favorable to the Commonwealth, the prevailing party at trial.'" *Aponte v. Commonwealth*, 68 Va. App. 146, 156 (2017) (quoting *Hairston v. Commonwealth*, 67 Va. App. 552, 560 (2017)). "In reviewing the denial of a motion to suppress based on the alleged violation of an individual's Fourth Amendment rights, we consider the evidence introduced at both the suppression hearing and the trial." *Bagley v. Commonwealth*, 73 Va. App. 1, 12-13 (2021).

[3] LIDAR, or "Light Detection And Ranging," is "the technology of measuring target range using reflected light." LIDAR devices are used in traffic enforcement by "determin[ing] target range and speed based on the time-of-flight of laser light pulses reflected off a target." LIDAR device is synonymous with "laser speed-measuring device" and "LIDAR unit." NHTSA, LIDAR Speed-Measuring Device Performance Specifications, DOT HS 809 811 (2013), https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/809811-lidarspeedmeasuringdevice.pdf.

red light. Detective Seibert turned off his emergency equipment and did not pursue the subject vehicle any further. At the time of the incident on January 23, 2021, Detective Seibert "had no idea who was driving" the subject vehicle.

After giving up his pursuit of the subject vehicle, Detective Seibert went to the police station where, using the vehicle's description and license plate number, he entered the subject vehicle into the VCIN/NCIC[4] database. The NCIC report described the vehicle and advised officers "to use caution. The vehicle fled a traffic stop in Arlington on 1/23/2021 at 0200 hours. If located, stop, ID occupants, secure vehicle for evidence." A "BOLO" or "be on the lookout" was also put out for the subject vehicle. As Detective Seibert explained, BOLOs are "usually put out right away after an incident . . . . Most likely, the vehicle is still on the roadways, so that's put out in an attempt for local jurisdictions and . . . state police to . . . have their attention drawn toward any vehicles with that tag, or make, model, or color."

On January 30, 2021, early in the morning, Virginia State Trooper Kashmer was patrolling Interstate 66 East when he received an alert on the subject vehicle from a nearby license plate reader. When a trooper receives a license plate reader hit, they "get like a ringing tone on [their] computers and then [they] have to run the tag to determine what the actual hit is." Trooper Kashmer ran the license plate through NCIC, but "didn't have time to read through the . . . NCIC hit, other than the fact that it was the stolen vehicle that came through the [license plate reader]," before he spotted the subject vehicle. Joined by Arlington County Police Officer Roussin, in a separate police car, Trooper Kashmer followed the subject vehicle, which was operating lawfully, into a CVS parking lot, where it backed into a parking spot. Trooper Kashmer and Officer Roussin blocked the subject vehicle in and conducted a "felony stop."

---

[4] VCIN/NCIC refers to the Virginia Criminal Information Network/National Crime Information Center.

Trooper Kashmer and Officer Roussin exited their cars, drew their weapons "for officer safety," and ordered the driver, Green, out of the subject vehicle. Green stepped out of the subject vehicle and was immediately placed in handcuffs, without incident. The officers re-holstered their guns, which "were [not] drawn for more than about 14 seconds." Trooper Kashmer initially told Green that he was being detained because the car was reported stolen. Green provided his driver's license and replied that he was the owner and had not reported his car stolen. At that time, Trooper Kashmer returned to his vehicle and pulled the NCIC report. About two minutes after the stop commenced, Trooper Kashmer used the NCIC report to confirm that Green was the owner of the subject vehicle. He then had time to read the NCIC report and learned that the subject vehicle was not reported stolen but was "described as a felony vehicle by reason of the felony of eluding" for an incident on January 23, 2021.

After Green was detained in handcuffs, Officer Roussin approached the subject vehicle to determine if there were any other occupants. Shining his flashlight through the front passenger window, Officer Roussin observed no other occupants; instead he saw part of a pistol grip and gun magazine protruding from an unzipped backpack that sat on the front passenger floorboard and rested against the seat. Within five minutes of the stop, three or four other Arlington County police officers had arrived and Officer Roussin alerted them to the presence of the gun in Green's car.

Officer Kumar, one of the Arlington County police officers who was dispatched to the scene to assist in the felony vehicle stop, observed Green standing by Trooper Kashmer's car and read Green his *Miranda v. Arizona*, 384 U.S. 436 (1966), rights. In addition to Officer Kumar's patrol car, approximately four other law-enforcement vehicles were in the CVS parking lot with their emergency lights on.

Detective Seibert was called to the scene and arrived shortly after Officer Kumar. Detective Seibert conferred with the officers on scene and, approximately ten minutes after his arrival,

- 4 -

approached Green and began to question him about the January 23 eluding incident. In his statement to Detective Seibert, Green admitted that he was driving the subject vehicle the previous Friday night around 2:00 a.m.[5] Green claimed he was suffering from a panic attack at the time. He recalled being parked in a neighborhood when he saw a police officer arrive, but told Detective Seibert that he did not think the officer was there for him because he had not done anything wrong. Green, a convicted felon, also acknowledged that he knew the gun was in the car.

Prior to trial, Green moved to suppress any evidence and statements "obtained as a result of [his] illegal arrest, said arrest being without probable cause" and any evidence "obtained as a result of the illegal search [of his] vehicle, said search being without probable cause, and without a search warrant." The court denied both motions to suppress, as well Green's motions to strike the evidence, and convicted him of eluding, reckless driving, and possession of a firearm after previously having been convicted of a violent felony. The trial court overruled Green's motion to set aside the verdict, and this appeal followed.

## ANALYSIS

### 1. Standards of Review

When reviewing a trial court's denial of a motion to suppress, we are "bound by the trial court's factual findings unless those findings are plainly wrong or unsupported by evidence," but we review "the trial court's application of the law de novo." *Malbrough v. Commonwealth*, 275 Va. 163, 168-69 (2008). "[A] defendant's claim that evidence was seized in violation of the Fourth Amendment presents a mixed question of law and fact that we review *de novo* on appeal." *King v. Commonwealth*, 49 Va. App. 717, 721 (2007). "Thus, 'we give deference to the factual findings of the trial court but independently decide whether, under the applicable law, the manner in which the challenged evidence was obtained satisfies constitutional requirements.'" *Shiflett v.*

---

[5] The eluding incident occurred around 2:00 a.m. on the morning of Saturday, January 23.

*Commonwealth*, 47 Va. App. 141, 145-46 (2005) (quoting *Jackson v. Commonwealth*, 267 Va. 666, 672 (2004)).

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

2. *The stop was a lawful investigative detention, supported by reasonable suspicion*.

The Fourth Amendment to the United States Constitution protects against "unreasonable searches and seizures." "Fourth Amendment jurisprudence recognizes three categories of police-citizen [contacts]: (1) consensual encounters, (2) brief, minimally intrusive investigatory detentions based upon specific, articulable facts, commonly referred to as *Terry* [*v. Ohio*, 392 U.S. 1 (1968),] stops, and (3) highly intrusive arrests and searches founded on probable cause." *Blevins v. Commonwealth*, 40 Va. App. 412, 420-21 (2003) (first alteration in original) (quoting *Wechsler v. Commonwealth*, 20 Va. App. 162, 169 (1995)). There is no doubt that "stopping an automobile and detaining its occupants constitute[s] a 'seizure' within the meaning of [the Fourth] Amendmen[t]." *Berkemer v. McCarty*, 468 U.S. 420, 436-37 (1984) (second and third alterations in original)

(quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).  The question raised by Green in his motion to suppress and on appeal is whether his encounter with law enforcement on January 30, 2021, was a "brief, minimally intrusive investigatory detention[]," or a "highly intrusive arrest[]." *Blevins*, 40 Va. App. at 421.[6]

Green argues that the encounter amounted to an arrest because he "was ordered out of his vehicle at gunpoint and immediately handcuffed, his vehicle blocked in its parking space by police vehicles, and . . . was surrounded by at least 4 armed, uniformed officers within arm's reach."  We disagree.

"The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (quoting *Terry*, 392 U.S. at 19).  "As a general matter, society's concern for the safety of law enforcement officials when they are 'conducting [their] duties is of paramount importance.'" *Moore v. Commonwealth*, 25 Va. App. 277, 283 (1997) (alteration in original) (quoting *Harris v. Commonwealth*, 241 Va. 146, 151 (1991)).  "*Terry* recognized the reasonableness of a minimal intrusion on personal privacy to insure [sic] the safety of an officer investigating, in a public place, a reasonable suspicion of lawbreaking." *Id.* at 286.

None of the cases Green cites support his argument that the government's use of force in this case—the limited use of their firearms and the decision to handcuff Green during the investigation—was unreasonable and transformed the investigative detention into an arrest.  Relying on *Sattler v. Commonwealth*, 20 Va. App. 366 (1995), Green argues that we "specifically condemned" an interpretation of the Fourth Amendment that "would allow the police to conduct all

---

[6] Green concedes that he "do[es not] disagree with the [trial c]ourt's determination that there was a reasonable basis to stop the vehicle."

traffic encounters at gunpoint, in their sole discretion, and handcuff everyone stopped," a result he claims would inevitably follow an affirmance in this case. However, in *Sattler* we held

> [that an] officer's generalized policy of frisking all persons does not satisfy the restrictions imposed by *Terry*. "Indeed, if everyone is assumed to be armed and dangerous until the officer is satisfied that he or she is not, then officers would be able to frisk at will—a result not contemplated by the Fourth Amendment."

20 Va. App. at 369 (quoting *New Jersey v. Garland*, 636 A.2d 541, 548 (N.J. Super. Ct. App. Div. 1994)). We considered whether the officer in *Sattler* had "specific and articulable facts upon which to conclude that Sattler was armed and dangerous," and thus properly subjected to a *Terry* frisk, *id.*, not whether the officer, possessing reasonable suspicion that crime was afoot, had acted unreasonably in his method of detaining Sattler for further investigation. The Fourth Circuit cases Green cites are similarly inapposite as they analyze the level of suspicion necessary to conduct *Terry* frisks. *See United States v. Powell*, 666 F.3d 180 (4th Cir. 2011); *United States v. Sakyi*, 160 F.3d 164 (4th Cir. 1998).

To the contrary, in this case we analyze the officers' decision to draw their weapons for a few seconds to conduct a felony stop on a vehicle and their decision to place Green in handcuffs while continuing their investigation. This use of force and restraint is, unquestionably, an intrusion on Green's personal security and constitutes a seizure of Green's person, but it is not equivalent to a pat down of his person, as occurred in *Sattler*. The question is whether the officers acted reasonably under the circumstances. There is no "litmus-paper test for distinguishing . . . when a seizure exceeds the bounds of an investigative stop." *Florida v. Royer*, 460 U.S. 491, 506 (1983) (alteration in original). "[I]n 'evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.'" *Thomas v. Commonwealth*, 16 Va. App. 851, 856 (1993) (quoting *DePriest v. Commonwealth*, 4 Va. App. 577, 586 (1987)), *aff'd en banc*, 18 Va. App. 454 (1994). "While the 'investigative methods employed should be the least

intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time,' the 'scope of the intrusion permitted will vary [with each case].'" *Id.* at 856-57 (alteration in original) (quoting *Royer*, 460 U.S. at 500).

Green argues that the use of firearms and handcuffs was unreasonable and more than the least restrictive means necessary because there were no "fact[s] or circumstances known to Trooper Kashmer or [O]fficer Roussin and individualized to the driver, Green, on January 30[,] 2021, to support his immediately being handcuffed at gunpoint." However, we have consistently held that "[b]rief, complete deprivations of a suspect's liberty, including handcuffing, 'do not convert a stop and frisk into an arrest so long as the methods of restraint used are reasonable to the circumstances.'" *Id.* at 857 (quoting *United States v. Crittendon*, 883 F.2d 326, 329 (4th Cir. 1989)); *Johnson v. Commonwealth*, 20 Va. App. 49, 55 (1995). The officers' use of their firearms to obtain control over the situation and conduct an investigative stop likewise "does not necessarily elevate a lawful stop into a custodial arrest." *Harris v. Commonwealth*, 27 Va. App. 554, 566 (1998) (quoting *United States v. Leshuk*, 65 F.3d 1105, 1110 (4th Cir. 1995)).

In the dark, early morning hours of January 30, Green was ordered out of his vehicle at gunpoint by two uniformed law-enforcement officers who believed Green to be in possession of a stolen vehicle. Within 14 seconds, the officers re-holstered their weapons and handcuffed Green. The officers testified, and the trial court accepted, that they drew their weapons in conducting the felony stop for "officer safety" purposes. This intrusion on Green's personal privacy was

reasonable under these circumstances and therefore did not transform the investigative detention into an arrest.[7]

### 3. The officers did not unlawfully extend the stop beyond the time necessary to accomplish its "mission."

Green asserts that the seizure was unlawful because it was "prolonged beyond the time reasonably required to complete th[e] mission" of investigating the allegedly stolen vehicle. *Rodriguez v. United States*, 575 U.S. 348, 350-51 (2015) (alteration in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). The initial "mission" of the stop on January 30, 2021, was to investigate what Trooper Kashmer believed to be a stolen vehicle. Within two minutes of the stop, law enforcement confirmed that Green owned the subject vehicle, which had not been reported stolen but was sought for eluding. Thus, Green argues, the mission of the stop was complete and he should have been immediately released.

As the Supreme Court stated in *Caballes*, and reaffirmed in *Rodriguez*, "a traffic stop 'prolonged beyond' [the time reasonably required to complete the stop's mission] is 'unlawful.'" *Rodriguez*, 575 U.S. at 357. Inquiries such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance" are de minimis and serve to ensure the safety of the officer and the highways, and thus "stem[ ] from the mission of the stop itself." *Id.* at 355-56. Moreover, "[i]f an officer develops independent reasonable suspicion or probable cause that an occupant has committed an additional traffic offense or crime, the officer may extend the stop for a reasonable amount of

---

[7] Green also argues that the seizure was an arrest and not an investigative detention because "[t]here was no investigation." As the trial court found, however, the officers did investigate their suspicion of Green's criminal activity. After detaining Green for, initially, possession of a stolen car, the officers' investigation confirmed Green's identity, learned that he owned the car, reviewed the NCIC report and confirmed that the car was sought for eluding, and called in Detective Seibert, who put the report into the NCIC database, to continue the investigation.

time in order to confirm or dispel that new suspicion." *Williams v. Commonwealth*, 71 Va. App. 462, 482 (2020).

Within two minutes of the stop, Trooper Kashmer and Officer Roussin not only determined that Green was the owner but also that the car was wanted for eluding. Thus, although the initial "mission" of the stop was accomplished, a new "mission" arose. Consequently, the officers were permitted to extend the length of the stop to investigate their newly developed reasonable suspicion that Green was involved in an eluding incident the week before.[8]

### 4. The gun was in plain view.

Green argues that the trial court erred in denying his motion to suppress the gun found in his car because the police searched his car without probable cause. However, because the gun was in plain view, protruding from an open bag, visible through the front passenger side window, and observed by the officer without entering the car, it was not found as a result of a search at all.

The Fourth Amendment protection against unreasonable searches only protects an individual when he has a reasonable expectation of privacy in the item searched. "[A]n individual has no reasonable expectation of privacy in items that are in plain view." *Commonwealth v. Thornton*, 24 Va. App. 478, 483 (1997) (quoting *Arnold v. Commonwealth*, 17 Va. App. 313, 318 (1993)). As such, the plain view doctrine "only applies to seizures because, by definition, if a police officer has a legal right to be in a place where he observes an item in plain view, no 'search' takes place, and it is only the seizure of the item that implicates the Fourth Amendment." *Cauls v. Commonwealth*, 55 Va. App. 90, 98 (2009) (citing *Arizona v. Hicks*, 480 U.S. 321, 326 (1987)). Before the plain view doctrine applies, three requirements must be satisfied:

---

[8] Because both the initial stop and the investigation were lawful, Green's statements are not the fruit of the poisonous tree.

> 1) that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, 2) *that the incriminating character of the evidence must be immediately apparent*, and 3) that the officer have a lawful right of access to the object itself.

*Id.* at 99 (quoting *Vaughn v. Commonwealth*, 53 Va. App. 643, 648 (2009)).

Because the stop and investigative detention were lawful, Officer Roussin did not violate the Fourth Amendment when merely looking through the window of Green's car. As noted, the gun, with its incriminating character apparent, was visible to Officer Roussin and in plain view. The officer's use of his flashlight to illuminate the interior of the car "[did] not transform his observation into a search." *Gibson v. Commonwealth*, 50 Va. App. 744, 751 (2007) (quoting *Marshall v. United States*, 422 F.2d 185, 189 (5th Cir. 1970)). Because Green's assignment of error challenges only the *search of the car* and not the *seizure of the firearm*, our analysis ends here.[9] *See Simmons v. Commonwealth*, 63 Va. App. 69, 75 n.4 (2014) ("Rule[ ] . . . 5A:20(c) require[s] us to hold that this issue is waived because it was not part of appellant's assignment of error on . . . brief.").[10]

### 5. The evidence was sufficient to convict.

Green's challenge to the reckless driving conviction is limited to his claim that his "criminal agency . . . was not proven absent the post arrest statement of the Appellant." Because all of

---

[9] Regardless, we note that by the time the officers seized the gun, they had confirmed Green's status as a convicted felon.

[10] Green argues in his eighth assignment of error that "[t]he trial court abused its discretion in basing its vehicle search ruling upon the verbal testimony of the searching officer, which testimony is contradicted by that officer[']s written report of the arrest and search event." Green claims that because Officer Roussin's report, written the day after the arrest, noted that Green was the sole occupant of the car, Officer Roussin violated Green's Fourth Amendment rights by "clearing" the vehicle of any additional passengers. By extension, Green asserts that the gun was found only because of Officer Roussin's illegal "clearing" of the vehicle. Because the gun was visible in plain view from a position in which Officer Roussin was lawfully present, we reject this assignment of error.

Green's statements were properly admitted into evidence, the trial court did not err in convicting Green of reckless driving.

Pertaining to the eluding conviction, Green argues for the first time on appeal that the elements of eluding were not proven because "Green's vehicle was stopped when Detective Seibert momentarily activated his emergency equipment." Green argues that "[t]he clear language of [the eluding] statute requires the driver of the vehicle signaled by the officer to be in motion, and then fail '. . . to bring his motor vehicle to a stop.'" However, Green failed to make this argument to the trial court. Although Green *mentioned* in his motion to strike that "the car was from a parked position," he never once argued at trial that the car's position at the time it is signaled to stop is an element of the offense. Instead, Green emphasized that "the officer . . . didn't finish the pursuit"; "very shortly after the car allegedly driven by Mr. Green went out of sight, the officer turned his emergency equipment off." Arguing lack of evidence of intent, Green questioned: "And from a position of being parked, how is someone to know that the officer intends to stop them as opposed to anybody else that's there?" Turning to the endangerment element of eluding, Green argued:

> Normally officers stop vehicles that are in motion for violating the traffic laws. In this case, we have a parked vehicle that when the officer turned on his light, he just normally proceeded out into traffic and made an illegal left turn through a light. And that was it. The officer turned off his equipment and didn't pursue. So he didn't endanger himself and . . . any signal that might have been given initially was discontinued.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. "The purpose of this contemporaneous objection requirement is to allow the trial court a fair opportunity to resolve the issue at trial, thereby preventing unnecessary appeals and retrials." *Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015). Because none of Green's arguments in his motion to strike the eluding charge pertain to the

question of whether the vehicle must be in motion when police attempt to initiate a traffic stop, the trial court was not on notice of this argument and it is waived under Rule 5A:18. Furthermore, "[a]lthough Rule 5A:18 contains exceptions for good cause or to meet the ends of justice, [Green] does not argue these exceptions and we will not invoke them *sua sponte*." *Williams v. Commonwealth*, 57 Va. App. 341, 347 (2010).

Green's remaining assignment of error challenging the eluding conviction asserts that "[t]he trial court abused its discretion in basing its finding of guilt on the charge of eluding[ ] upon the verbal testimony of the police officer" where the officer's "testimony is contradicted by the video recording of the eluding event." Specifically, Green contends that Detective Seibert's testimony that on January 23 Green sped away after Detective Seibert activated his emergency equipment was contradicted by video evidence that the car "moved normally into the traveled portion of the roadway from a parked stopped position . . . and proceeded to drive away."

"Determining the credibility of witnesses . . . is within the exclusive province of the [trial court], which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (first alteration in original) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). In examining the sufficiency of the evidence, our deference to the trial court does not end with conclusions on witness credibility. Rather,

> [w]e owe deference to the trial court's interpretation of all of the evidence, including video evidence that we are able to observe much as the trial court did. Such deference stems not from the trial court being in a superior position to view the video evidence but from the difference in our respective roles. As factfinder, a trial court views video and other evidence to determine what it believes happened; we, on appellate review, view video evidence not to determine what we think happened, but for the limited purpose of determining whether any rational factfinder could have viewed it as the trial court did.

*Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022).

Despite his testimony occurring over a year after the eluding incident, Detective Seibert's testimony was largely consistent with what was depicted on his body worn camera footage. As the trial court observed, having heard and seen the witnesses and the body worn camera footage, Green "sped at such a high rate of speed, he literally vanished until a faint sighting of tail lights proceeding through a controlled intersection," which "endangered his life." Detective Seibert's testimony was not inherently incredible and there was abundant evidence in the record to support the eluding conviction.[11]

CONCLUSION

Having developed reasonable suspicion that Green was in possession of a stolen car, law-enforcement officers lawfully stopped and detained him to investigate a felonious offense. During that investigation, reasonable suspicion of a different crime, felony eluding, materialized, and the detention was properly extended to further investigate that offense. Because the investigative detention was lawful, none of Green's statements made to law enforcement were the fruit of the poisonous tree. A firearm was visible in plain view, from a lawful vantage point,

---

[11] In discussing the alleged inconsistencies between Detective Seibert's testimony and his body worn camera footage, Green appears to argue on brief that the evidence failed to exclude all reasonable hypotheses of innocence. Assuming without deciding that this argument was encompassed by one of Green's assignments of error, we disagree. As we recently held:

> [I]t is the *fact finder*, not this Court, that determines whether a defendant's hypothesis is reasonable. Giving due deference to the trier of fact, this Court may only review a factual finding to determine if it is "plainly wrong or without evidence to support it." If the result is one that reasonably *could* be reached after consideration of the totality of the circumstances, then we may not substitute our judgment of any factual findings.

*Fary v. Commonwealth*, 77 Va. App. 331, 347 (2023) (en banc) (quoting *Commonwealth v. Moseley*, 293 Va. 455, 466 (2017)). Green's hypothesis of innocence, that he did not know Detective Seibert's signal to stop was directed at him, was presented to the trial court, which had the opportunity to consider it. Having so considered, the trial court was not plainly wrong in rejecting Green's hypothesis of innocence and accepting the Commonwealth's evidence of guilt.

protruding from a bag sitting on the front passenger floorboard.  Therefore, the trial court properly denied Green's motions to suppress.  Further, the evidence at trial amply supported Green's convictions.  The judgment of the trial court is affirmed.

*Affirmed.*